IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN BRIDAL AND PROM INDUSTRY ASSOCIATION, INC., ALLURE BRIDALS, INC., ALYCE DESIGNS, INC., JOVANI FASHION, LTD., LA FEMME BOUTIQUE, INC., MON CHERI BRIDALS, LLC, MORI LEE, LLC, NEXT CENTURY PRODUCTIONS, INC. d/b/a "SYDNEY'S CLOSET, and PROMGIRL, LLC, | ) ) ) ) ) ) ) ) ) | Case No. 1:16-cv-00023 **Judge John Robert Blakey** **Magistrate Judge Susan E. Cox** |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| SHEN CHEN, et al., | ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' *EX PARTE* MOTION FOR ENTRY OF A TEMPORARY RESTRAINING ORDER, INCLUDING (1) A TEMPORARY INJUNCTION; (2) AN ORDER TO TEMPORARILY TRANSFER THE INFRINGING WEBSITES; (3) A TEMPORARY ASSET RESTRAINT; (4) EXPEDITED DISCOVERY; AND (5) SERVICE OF PROCESS BY EMAIL AND ELECTRONIC PUBLICATION**

Plaintiffs, by and through their undersigned counsel, hereby submit this Memorandum of Law in support of their *Ex Parte* Motion seeking entry of a Temporary Restraining Order, including a temporary injunction, a temporary transfer of the Infringing Websites, a temporary asset restraint, expedited discovery, and service of process by email and electronic publication (the "*Ex Parte* Motion for TRO").

i

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .iv

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

      I.     PLAINTIFFS' BUSINESS AND FEDERALLY REGISTERED TRADEMARKS AND COPYRIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

      II.    DEFENDANT'S UNLAWFUL CONDUCT CENTERS AROUND HIJACKING PLAINTIFFS' BRANDS TO DECEIVE CONSUMERS INTO PURCHASING IMITATION KNOCKOFFS FROM THE INFRINGING WEBSITES . . . . . . . 8

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      I.     DEFENDANTS ARE SUBJECT TO PERSONAL JURISDICTION OF THIS COURT BECAUSE THEY DIRECT THEIR BUSINESS ACTIVITIES TOWARDS RESIDENTS OF THE STATE OF ILLINOIS AND THIS JUDICIAL DISTRICT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

           A.    Defendants' Operation of the Infringing Websites to Sell Counterfeit Products to Residents of the United States and Illinois Satisfies the Jurisdictional Requirements of the Illinois Long-Arm Statute . . . . . . . .14

           B.    Exercising Personal Jurisdiction Over Defendants is Consistent with Constitutional Due Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

      II.    PLAINTIFFS ARE ENTITLED TO AN *EX PARTE* TEMPORARY RESTRAINING ORDER TEMPORARILY DISABLING THE INFRINGING WEBSITES, TEMPORARILY RESTRAINING DEFENDANTS' ASSETS, EXPEDITING DISCOVERY AND ALLOWING SERVICE OF PROCESS BY EMAIL AND ELECTRONIC PUBLICATION . . . . . . . . . . . . . . . . . . . . . . . . . .17

           A.    Plaintiffs are Likely to Succeed on the Merits of Their Claims for Trademark Infringement, False Designation of Origin, Cyberpiracy, Copyright Infringement and Uniform Deceptive Trade Practices . . . . . . 19

                **1. Trademark Infringement and Counterfeiting** . . . . . . . . . . . . . . . 20

                **2. False Designation of Origin** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

ii

**3. Cyberpiracy**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**4. Copyright Infringement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**5. Illinois Uniform Deceptive Trade Practices** . . . . . . . . . . . . . . . . . 28

B. <u>Defendants' Sale of Counterfeit Products Irreparably Harms Plaintiffs and there is No Adequate Remedy at Law</u> . . . . . . . . . . . . . . . . . . . . . . . . . 30

C. <u>The Balance of Hardships Unequivocally Weighs in Plaintiffs' Favor</u> . . 31

D. <u>An Injunction is in the Public Interest</u> . . . . . . . . . . . . . . . . . . . . . . . . . 32

III. THE EQUITABLE RELIEF PLAINTIFFS ARE SEEKING IS APPROPRIATE . . 33

A. <u>Plaintiffs' Request for a Temporary Restraining Order Immediately Enjoining Defendants' Unauthorized and Unlawful Use of Plaintiffs' Trademarks and Copyrights Is Appropriate</u> . . . . . . . . . . . . . . . . . . . . . . . 34

B. <u>An Order Temporarily Transferring the Infringing Websites to Plaintiffs' Control is Appropriate</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

C. <u>An Order Preventing the Fraudulent Transfer of Assets is Appropriate</u> . 38

D. <u>Plaintiffs are Entitled to Expedited Discovery</u> . . . . . . . . . . . . . . . . . . . 39

E. <u>Service of Process by E-mail and Electronic Publication Is Warranted and Necessary in this Case because Defendants have Purposefully Concealed Their True Identities in Registering the Infringing Websites and Rely Primarily on Electronic Communications to Communicate with Registrars and Customers</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41

IV. A BOND SHOULD SECURE THE INJUNCTIVE RELIEF PLAINTIFFS ARE SEEKING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .47

# TABLE OF AUTHORITIES

## CASES CITED                                                         PAGE

*Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . 18, 30

*Advanced Tactical Ordinance, LLC v. Real Action Paintball, Inc.*,
    751 F.3d 796 (7th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Aero Products Int'l., Inc. v. Intex Corp.*,
    No. 02 C 2590, 2002 WL 31109386 (N.D. Ill. Sept. 20, 2002) . . . . . . . . . . . . . . . . . . . . 13

*All Star Championship Racing, Inc. v. O'Reilly Auto. Stores, Inc.*,
    940 F.Supp.2d 850 (C.D. Ill. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 28

*Am. Bridal & Prom Indus. Ass'n, et al. v. affordablebridaldress.com, et al.*,
    No. 3-14-cv-2311-AET-LHG (D.N.J. Sept. 24, 2014) (unpublished) . . . . . . . . . . . . . . . 35

*Am. Broad. Co. v. Maljack Prods., Inc.*, 34 F. Supp. 2d 665 (N.D. Ill. 1998) . . . . . . . . . . . . . . 29

*Arkansas Best Corp. v. Carolina Freight Corp.*, 60 F.Supp.2d 517 (W.D.N.C. 1999) . . . . . . . . 47

*Atari, Inc. v. North Am. Phillips Consumer Elecs. Corp.*, 672 F.2d 607 (7th Cir. 1982) . . . . 26, 27

*Bernina of America, Inc. v. Fashion Fabrics Int'l, Inc.*,
    No. 01 C 585, 2001 WL 128164 (N.D. Ill. Feb.9, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Berthold Types Ltd. v. European Mikrograf Corp.*, 102 F.Supp.2d 928 (N.D. Ill. 2010) . . . . . . 13

*Black & Decker Corp. v. Positec USA Inc.*,
    No. 11–cv–5426, 2015 WL 1543262 (N.D. Ill. Mar. 31, 2015) . . . . . . . . . . . . . . . . . . . 21

*Burberry Ltd., et al. v. Weng Jungpeng, et al.*,
    No. 1:15-cv-07994 (N.D. Ill. Oct. 15, 2015) (unpublished) . . . . . . . . . . . . . . . . . . . . . . 35

*Burger King Corp. v. Majeed*, 805 F. Supp. 994 (S.D. Fla. 1992) . . . . . . . . . . . . . . . . . . . . . . . 31

*Burger King v. Rudzewicz*, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) . . . . . . . . 15-16

*CAE, Inc. v. Clean Air Eng'g Inc.*, 267 F.3d 660 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 22

*Chanel, Inc. v. The Partnerships, et al.*,
    No. 2:11-cv-01508-APG-PAL (D. Nev. Sept. 26, 2011) (unpublished) . . . . . . . . . . . . 35

*Christian Dior Couture, S.A. v. Lei Liu, et al.*,
    No. 1:15-cv-06234 (N.D. Ill. July 27, 2015) (unpublished) . . . . . . . . . . . . . . . . . . . . . . 35

*Crown Crafts, Inc. v. Aldrich*, 148 F.R.D. 151 (E.D.N.C. 1993) . . . . . . . . . . . . . . . . . . . . . . . . 40

*CSC Holdings, Inc. v. Redisi*, 309 F.3d 988 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Deckers Outdoor Corp. v. Chen Bing, et al.*,
No. 1:15-cv-09212 (N.D. Ill. Oct. 28, 2015) (unpublished) . . . . . . . . . . . . . . . . . . . . . . 34

*Deckers Outdoor Corp. v. P'sips and Unincorporated Assoc.*,
No. 13 C 2167, 2013 WL 1337616 (N.D. Ill. Mar. 27, 2013) . . . . . . . . . . . . . . 37, 40, 42

*Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*, 94 F.3d 376 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . 21

*Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456 (7th Cir. 2000) . . . . . . . .18, 21, 22, 30, 32

*Ellsworth Associates v. United States*, 917 F.Supp. 841 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . 39

*Euromarket Designs, Inc. v. Crate & Barrel Ltd.*, 96 F.Supp.2d 824 (N.D. Ill. 2000) . . . . . 14, 15

*Feist Publications, Inc. v. Rural Tel. Serv.*, 499 U.S. 340, 111 S.Ct. 1282 (1991) . . . . . . . . . . . 26

*Flentye v. Kathrein*, 485 F.Supp.2d 903 (N.D. Ill. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24-25

*FMC Corp. v. Varonos*, 892 F.2d 1308 (7th Cir.1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*G. Heileman Brewing Co., Inc. v. Anheuser-Busch, Inc.*, 873 F.2d 985 (7th Cir. 1989) . . . . . . . 22

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc.*,
549 F.3d 1079 (7th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Greenberg v. United Airlines*, 206 Ill.App.3d 40, 563 N.E.2d 1031 (1st Dist.1990) . . . . . . . . . 28

*Guru Demin Inc. d/b/a True Religion Brand Jeans*,
No. 1:15-cv-06220 (N.D. Ill. July 23, 2015) (unpublished) . . . . . . . . . . . . . . . . . . . . . . 35

*Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.*,
240 U.S. 251, 36 S.Ct. 269, 60 L.Ed. 629 (1916) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Helene Curtis Industries, Inc. v. Church & Dwight Co., Inc.*, 560 F.2d 1325 (7th Cir. 1977) . . 30

*Ideal Indus., Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018 (7th Cir. 1979) . . . . . . . . . . . . . . . . . 30

*Illinois v. Hemi Group, LLC*, 622 F.3d 754 (7th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re LDK Solar Secs. Litig.*, No. C 07-05182, 2008 WL 2415186 (N.D. Cal. Jun. 12, 2008) . . 44

*Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079 (7th Cir. 1988) . . . . . . . 30

*Int'l Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154 (1945) . . . . . . . . . . . . . . . . . . . . . . . . 16

*Janmark, Inc. v. Reidy*, 132 F.3d 1200 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*JCW Investments, Inc. v. Novelty, Inc.*, 222 F.Supp.2d 1030 (N.D. Ill. 2002) . . . . . . . . . . . . . . 27

*Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F. 3d 427 (7th Cir. 1999) . . . . . . 23

*Kraft Food Holdings, Inc. v. Helm*, 205 F. Supp. 2d 942 (N.D. Ill. 2002) . . . . . . . . . . . . . . . 35-36

*Krause Int'l Inc. v. Reed Elsevier, Inc.*, 866 F. Supp. 585 (D.D.C. 1994) . . . . . . . . . . . . . . . . 31

*Lettuce Entertain You Enters., v. Leila Sophia AR, L.L.C.*,
    703 F.Supp.2d 777 (N.D. Ill. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982 (11th Cir. 1995) . . . . . . . . . . . . 37

*Long v. Board of Educ., Dist. 128*, 167 F.Supp.2d 988 (N.D. Ill. 2001) . . . . . . . . . . . . . . . . . . 17

*Louis Vuitton Malletier & Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567 (E.D. Pa. 2002) . . . . . . . . 25

*Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806 (6th Cir. 2004) . . . . . . . . . . . . . . 24

*Lululemon Athletica Canada, Inc. v. Zai Dao Li, et al.*,
    No. 1:15-cv-07721 (N.D. Ill. Sept. 15, 2015) (unpublished) . . . . . . . . . . . . . . . . . . . . . . . 35

*Luxottica Group S.p.A. v. Chen Xiaomin, et al.*,
    No. 1:15-cv-06197 (N.D. Ill. July 27, 2015) (unpublished) . . . . . . . . . . . . . . . . . . . . . . . . 35

*Luxottica Group S.p.A. v. Zhang Yufeng, et al.*,
    No. 1:15-cv-08245 (N.D. Ill. Sept. 30, 2015) (unpublished) . . . . . . . . . . . . . . . . . . . . . . . 35

*MacLean-Fogg Co. v. Ningbo Fastlink Equip. Co., Ltd.*,
    No. 08 CV 2593, 2008 WL 5100414 (N.D. Ill. Dec. 1, 2008) . . . . . . . . . . . . . . . . . . . . . 45

*Malarkey-Taylor Assocs., Inc. v. Cellular Telecomms. Indus. Ass'n*,
    929 F. Supp. 473 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

*MasterCard Int'l Inc. v. Trehan*, 629 F.Supp.2d 824 (N.D. Ill. 2009) . . . . . . . . . . . . . . 24, 25, 26

*Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111 (7th Cir. 1997) . . . . . . . . 30

*Microsoft Corp. v. Rechanik*, 249 F. App'x 476 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . 21

*Mid America Title Co. v. Kirk,* 59 F.3d 719 (7th Cir.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Monster Energy Co. v. The Partnerships, et al.*,
    No. 1:15-cv-09142 (N.D. Ill. Oct. 15, 2015) (unpublished) . . . . . . . . . . . . . . . . . . . 34, 37

*Monster Energy Company v. Chen Wensheng*, et al.,
    No. 15 C 4166, 2015 U.S. Dist. LEXIS 132283 (N.D. Ill. Sept. 29, 2015) . . . . . . . . . . . 16

*Monster Energy Co. v. Jing*, No. 15 C 277, 2015 WL 4081288 (N.D. Ill. July 6, 2015) . . . 21, 22

*Nanya Tech. Corp. v. Fujitsu Ltd.,*
CIV 06-00025, 2007 WL 269087 (D. Guam Jan. 26, 2007) . . . . . . . . . . . . . . . . . . . . . . . 44

*Neopost Industrie B.V. v. PFE Int'l Inc.,* 403 F. Supp. 2d 669 (N.D. Ill. 2005) . . . . . . . . . 20, 23

*New Eng. Merchants Nat'l Bank v. Iran Power Generation & Transmission Co.,*
495 F. Supp. 73 (S.D.N.Y. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Notaro v. Koch,* 95 F.R.D. 403 (S.D.N.Y. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Oakley, Inc. v. Zhang Yiyi, et al.,* No. 1:15-cv-05963 (N.D. Ill. July 16, 2015) (unpublished) . . 35

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978) . . . . 39

*Performance Health Systems, LLC v. Yongkang Union Indus. Co., Ltd., et al.,*
No. 1:15-cv-07932 (N.D. Ill. Sept. 25, 2015) (unpublished) . . . . . . . . . . . . . . . . . . . . . . 35

*PhD Marketing, Inc., et al. v. Dongguan Betos Electronic Co., et al.,*
No. 1:15-cv-07660 (N.D. Ill. Sept. 10, 2015) (unpublished) . . . . . . . . . . . . . . . . . . . . . . 35

*Pickett v. Prince*, 52 F.Supp.2d 893 (N.D. Ill. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Planned Parenthood Fed'n of America, Inc. v. Bucci,*
42 U.S.P.Q.2d 1430 (S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-15

*Playboy Enter., Inc. v. Baccarat Clothing Co*., 692 F.2d 1272 (9th Cir. 1982) . . . . . . . . . . . . 37

*Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145 (4th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . 21

*Popp v. Cash Station, Inc.,* 244 Ill.App.3d 87, 613 N.E.2d 1150 (1st Dist.1992) . . . . . . . . . . . 28

*Popular Enters., LLC v. Webcom Media Group, Inc.,*
225 F.R.D. 560 (E.D. Tenn. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45-46

*Publications International, Ltd. v. Meredith Corp.*, 88 F.3d 473 (7th Cir. 1996) . . . . . . . . . . . 27

*Purdue Research Found. v. Sanofi-Sythelabo, S.A.*, 338 F.3d 773 (7th Cir. 2003) . . . . . . . . . . 14

*Rathmann Grp. v. Tanenbaum,* 889 F.2d 787 (8th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*RAR, Inc. v. Turner Diesel, Ltd.,* 107 F.3d 1272 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . 14

*Re/Max N. Cent., Inc. v. Cook*, 272 F.3d 424 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Richemont Int'l SA, et al. v. Chen Mei, et al.,*
No. 1:15-cv-05991 (N.D. Ill. July 17, 2015) (unpublished) . . . . . . . . . . . . . . . . . . . . . . 35

*Richemont Int'l, et al. v. Jing Mi Ling, et al.,*
No. 1:15-cv-7482 (N.D. Ill. Sept. 8, 2015) (unpublished) . . . . . . . . . . . . . . . . . . . . . . . 35

*Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC*,
    87 F.Supp.3d 874, 877 (N.D. Ill. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007 (9th Cir. 2002) . . . . . . . . . . . . . . . . 45, 46

*River Light V, LP, et al. v. Yu Wen Peng, et al.*,
    No. 1:15-cv-08967 (N.D. Ill. Oct. 20, 2015) (unpublished) . . . . . . . . . . . . . . . . . . . . . . 34

*River Light V, L.P., et al. v. Zhangyali, et al.*,
    No. 1:15-cv-05918 (N.D. Ill. July 10, 2015) (unpublished) . . . . . . . . . . . . . . . . . . . . . . 35

*Runstadler Studios, Inc. v. MCM Ltd. Partnership*, 768 F.Supp. 1292 (N.D. Ill. 1991) . . . . . . . 27

*Shashi, Inc. v. Ramada Worldwide, Inc.*,
    No. Civ.A. 7:05CV00016, 2005 WL 552593 (W.D. Va. Mar. 1, 2005) . . . . . . . . . . . . 33

*Sherri Hill, et al. v. John Doe 1 a/k/a Wang Qinghe*,
    No. 1:12-cv-3014 (S.D.N.Y. Apr. 18, 2012) (unpublished) . . . . . . . . . . . . . . . . . . . . . . 35

*Slep-Tone Entertainment Corp. v. Sellis Enterprises, Inc.*, 87 F.Supp.3d 906 (N.D. Ill. 2015) . .23

*Spex, Inc. v. Joy of Spex, Inc.*, 847 F. Supp. 567 (N.D. Ill. 1994) . . . . . . . . . . . . . . . . . . . . . . . . 29

*Stahly, Inc. v. M.H. Jacobs Co.*, 183 F.2d 914 (7th Cir. 1950) . . . . . . . . . . . . . . . . . . . . . . . . 32-33

*Steele v. Bulova Watch Co.*, 344 U.S. 280, 73 S.Ct. 252, 254, 97 L.Ed. 319 (1952) . . . . . . . . 14

*Storck USA, L.P. v. Farley Cando Co.*, 14 F.3d 311 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . 31

*Tamburo v. Dworkin*, 601 F.3d 693 (7th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Tiffany (NJ), LLC v. Liu Zheng, et al.*,
    No. 0-11-cv-60171-CMA (S.D. Fla. Feb. 2, 2011) (unpublished) . . . . . . . . . . . . . . . . 35

*Title Trading Services USA, Inc. v. Kundu, et al.*,
    No. 3:14–cv–225–RJC–DCK, 2014 WL 4053571 (W.D.N.C. Aug. 15, 2014) . . . . . . . 44

*Trans Union LLC v. Credit Research, Inc.*, 142 F.Supp.2d 1029 (N.D. Ill. 2001) . . . . . . . . . . 22

*Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891 (7th Cir.2001) . . . . . . . . . . . . . . . . . . . . . . . 18, 22, 31

*U.S. v. Puerto Rico Sewer Authority*,
    No. 06-1624(PG), 2009 WL 1935851 (D.P.R. June 26, 2009) . . . . . . . . . . . . . . . . . . . 36

*V'soske, Inc. v. Vsoske.com*,
    No. 00 CIV 6099(DC), 2001 WL 546567 (S.D.N.Y. May 23, 2001) . . . . . . . . . . . . . . 25

*Vance v. Rumsfeld*, No. 6 C 6964, 2007 WL 4557812 (N.D. Ill. Dec. 21, 2007) . . . . . . . . . . . 39

*Watchworks, Inc. v. Total Time, Inc.*,
    No. 01 C 5711, 2002 WL 424631 (N.D. Ill. Mar. 29, 2002) . . . . . . . . . . . . . . . . . . . . . . 15

*Wesley–Jessen Division of Schering Corp. v. Bausch & Lomb Inc.*,
    698 F.2d 862 (7th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*White v. Marshall*, 771 F.Supp.2d 952 (E.D. Wis. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . 45

## **FEDERAL STATUTES**

15 U.S.C. § 1057(b) . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

15 U.S.C. § 1065 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

15 U.S.C. § 1114 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

15 U.S.C. § 1114(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 20

15 U.S.C. § 1116 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

15 U.S.C. § 1116(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 33

15 U.S.C. § 1116(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

15 U.S.C. § 1117(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 38

15 U.S.C. § 1117(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 41

15 U.S.C. § 1125(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 20, 23

15 U.S.C. § 1125(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

15 U.S.C. § 1125(d)(1)(A)(i)–(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

15 U.S.C. 1125(d)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

15 U.S.C. § 1127 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

17 U.S.C. § 410(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

17 U.S.C § 501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

17 U.S.C. § 501(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

17 U.S.C. § 502 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

17 U.S.C. § 504 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

17 U.S.C. § 505 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

Fed. R. Civ. P. 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 41, 46

Fed. R. Civ. P. 4(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Fed. R. Civ. P. 4(f)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 45, 46

Fed. R. Civ. P. 30(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Fed. R. Civ. P. 34(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Fed. R. Civ. P. 65 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Fed. R. Civ. P. 65(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 33

Fed. R. Civ. P. 65(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 47

Fed. R. Civ. P. 65(d)(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 33

**STATE STATUTES**

735 ILCS 5/2–209(a)(1)–(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

735 ILCS 5/2–209(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

735 ILCS 5/2–209(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

815 ILCS 510 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**OTHER AUTHORITIES**

11 Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure* § 2951 (1973) . . 36

C. Wright & A. Miller, *Federal Practice and Procedure* § 1061 (2d ed. 1987) . . . . . . . . . . . . 41

Jeremy A. Colby, *You've Got Mail: The Modern Trend Towards Universal Electronic Service of Process*, 51 Buff. L. Rev. 337 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

## <u>INTRODUCTION</u>

Plaintiffs bring this action against the Partnerships and Unincorporated Associations identified on Schedule "A" to the Amended Complaint (collectively, the "Defendants") for federal trademark infringement and counterfeiting (Count I), false designation of origin (Count II), cyberpiracy (Count III), copyright infringement (Count IV), and deceptive trade practices (Count V). As alleged in the Amended Complaint, the Defendants are promoting, advertising, marketing, distributing, offering for sale and selling counterfeit bridal gowns and formalwear under Plaintiffs' trademarks (collectively, the "Counterfeit Products"), through fully interactive commercial Internet websites operating under the domains listed in Schedule "A" to the Amended Complaint (collectively, the "Infringing Websites"). Defendants run a sophisticated counterfeiting operation that involves hijacking Plaintiffs' brands, deceiving the public, and generating profits at Plaintiffs' expense by selling imitation knockoffs in violation of Plaintiffs' intellectual property rights.

The Defendants create the Infringing Websites and design them to appear to be selling authentic and genuine products; however, they actually offer for sale low-quality, cheap, unlicensed Counterfeit Products to mislead consumers. The Infringing Websites share unique identifiers, such as website design and similarities of the Counterfeit Products offered for sale, establishing a logical relationship between them and suggesting that Defendants' counterfeiting operation arises out of the same transaction, occurrence, or series of transactions or occurrences. Defendants attempt to avoid liability by concealing both their identities and the full scope and interworking of their counterfeiting operations. Plaintiffs must file this action to combat Defendants' counterfeiting of their registered trademarks and copyrights, as well as to protect unknowing consumers from purchasing Counterfeit Products over the Internet.

## SUMMARY OF ARGUMENT

This Court has personal jurisdiction over Defendants because each Defendant targets Illinois residents and has offered to sell Counterfeit Products to consumers within the State of Illinois and this Judicial District. Defendants directly target their unlawful business activities toward consumers in Illinois and have caused and will continue to cause irreparable harm to Plaintiffs' businesses. Defendants intentionally deceive the public by trading upon Plaintiffs' reputation and goodwill by operating the Infringing Websites to sell and/or offer for sale unlicensed Counterfeit Products in violation of Plaintiffs' trademark and copyright rights.

Defendants should be prohibited from continuing their unlawful activities, and Plaintiffs respectfully requests that this Court issue *ex parte*: (1) a temporary restraining order against Defendants temporarily enjoining the manufacture, importation, distribution, offer for sale and sale of Counterfeit Products; (2) an order temporarily disabling the Infringing Websites pending the issuance of a final judgment in this matter; (3) an order temporarily restricting transfer of Defendants' assets to preserve Plaintiffs' right to an equitable accounting; (4) an order for expedited discovery allowing Plaintiffs to inspect and copy Defendants' records relating to the manufacture, distribution, offer for sale and sale of Counterfeit Products and Defendants' financial accounts; and (5) an order allowing service by electronic mail and electronic publication at the Infringing Websites.

Under Fed. R. Civ. P. 65(b), the court may grant a temporary restraining order without notice to the adverse party where the moving party's affidavits demonstrate that it will suffer irreparable injury. In light of the covert nature of online counterfeiting activities that predominantly take place in foreign jurisdictions and the need to establish an economic

disincentive for trademark counterfeiting, courts regularly issue such *ex parte* orders. *See, e.g.*, *The Counterfeit Website Cases* at Section III, *infra*.

Plaintiffs' well-pleaded factual allegations, which must be accepted as true, along with incontrovertible evidence of Defendants' counterfeiting and copyright infringement verified through the supporting declarations of Plaintiffs' CEO and Plaintiffs' expert witness, establishes that issuing a temporary restraining order against Defendants is necessary and proper. More specifically, Plaintiffs can demonstrate a strong likelihood of success on the merits, as further explained herein. Plaintiffs are the owners of various trademark registrations, and Defendants' use of Plaintiffs' trademarks to sell Counterfeit Products is causing both point-of-sale and post-sale consumer confusion. Defendants compound their unlawful use of Plaintiffs' trademarks by stealing Plaintiffs' original images protected by a valid U.S. copyright registration and common law copyrights, and illegally republish these photographs on the Infringing Websites as a way to advertise and promote the sale of Counterfeit Products. Furthermore, Defendants have irreparably harmed Plaintiffs through diminished goodwill and damage to Plaintiffs' reputation, and there is no adequate financial remedy that can compensate Plaintiffs for these damages. Issuance of an injunction is also in the public interest because it will prevent confusion among the public and prevent unknowing consumers from being deceived into purchasing Counterfeit Products.

An order temporarily transferring the Infringing Websites to Plaintiffs' control is warranted pursuant to 15 U.S.C. § 1116(a), which authorizes this Court "to grant injunctions . . . to prevent the violation of any right of the registrant of a mark . . .". Such relief will temporarily stop Defendants' unauthorized use of Plaintiffs' trademarks and copyrighted images in order to sell Counterfeit Products through the Infringing Websites. Moreover, under Fed. R. Civ. P.

65(d)(2)(C), this Court has the power to bind any third parties, such as domain name registries, hosting providers and financial institutions, who are in active concert with the Defendants or who aid and abet Defendants and are given actual notice of the order. Similarly, a temporary prejudgment asset freeze is also proper because Plaintiffs seek an equitable remedy in the accounting of Defendants' profits pursuant to 15 U.S.C. § 1117(a). Finally, an order authorizing service of process by email and electronic publication pursuant to Fed. R. Civ. P. 4 is warranted because Defendants go to great lengths to conceal their true identities and operate their businesses online through falsified and bogus registration records. In fact, serving Defendants by email as well as by electronic publication by redirecting traffic from each of the Infringing Websites to a domain owned and operated by Plaintiffs that will publish all of the relevant court filings for this action is the best method for ensuring that Defendants receive actual notice of this action and providing them the opportunity to defend and present their objections.

## **STATEMENT OF FACTS**

I.    PLAINTIFFS' BUSINESS AND FEDERALLY REGISTERED TRADEMARKS AND COPYRIGHTS

For nearly twenty years, Plaintiffs have manufactured and sold high quality bridal gowns and formalwear ("Plaintiffs' Products") throughout the world. *See* Declaration of Stephen Lang ("Lang Declaration") at ¶ 6. As manufacturers and retailers of unique bridal gowns and formalwear, Plaintiffs employ their own teams of dress designers, and invest substantial sums of money in the development of designs which fit their own branding strategies. *Id.* Today, Plaintiffs' Products are sold in approximately 5500 retail stores throughout the United States and throughout the world. *Id.* at ¶ 7. The original images Plaintiffs use to advertise and market these gowns are the original works of the Plaintiffs and licensed only to authorized distributors. *Id.*

4

Each year, Plaintiffs invest thousands of dollars in advertising their original unique dress designs. *Id.* at ¶ 7. These dresses are not only commercially available for sale throughout the country, but they are pictured in catalogs distributed throughout the country and overseas to retailers and others. *Id.* Plaintiffs have several trademarks registered with the United States Patent and Trademark Office; moreover, these trademarks have become synonymous with luxurious and elegant formalwear. *Id.* at ¶ 8. Plaintiffs' brands are now highly successful and well known throughout the United States. *Id.*

Because Plaintiffs are manufacturers and retailers of unique bridal gowns and formalwear, it employs their own team of dress designers, and invests significant sums of money in the development of designs that fit their own branding strategies. *Id.* at ¶ 9. Among Plaintiffs' most important assets is the intellectual property associated with their brands. *Id.* Specifically, Plaintiffs own several U.S. trademark registrations for their brands, as well as other marks used to identify the Plaintiffs' Products that they markets and sell. *Id.* at ¶ 11.

Plaintiffs' Products have become enormously popular and even iconic, driven by Plaintiffs' arduous quality standards and innovative design. *Id.* at ¶ 8. Among the purchasing public, genuine Plaintiffs' Products are instantly recognizable as such. *Id.* In the United States and around the world, the Plaintiffs' brands have come to symbolize high quality, and Plaintiffs' Products are among the most recognizable formalwear dresses in the world. *Id.*

Plaintiffs' Products are distributed and sold to consumers through boutiques owned and operated by Plaintiffs, authorized retailers throughout the United States, and online at through several websites owned and operated by the Plaintiffs ("Websites") *Id.* at 10; *see also* Complaint at ¶ 24. Plaintiffs incorporate a variety of distinctive marks in the design and marketing of the Plaintiffs' Products. *Id.* at ¶ 11. As a result of their longstanding use, Plaintiffs own common

law trademark rights in their trademarks. *Id.* Plaintiffs have also registered their trademarks with the United States Patent and Trademark Office. *Id.* Plaintiffs use their trademarks in connection with the advertising and marketing of the Plaintiffs' Products, which are collectively referred to as the "Plaintiffs' Trademarks." *Id.*

Genuine and authentic copies of the U.S. registration certificates for the Plaintiffs' Trademarks are attached to the Lang Declaration as Exhibit 2. Plaintiffs' Trademarks are valid, subsisting, in full force and effect, and incontestable pursuant to 15 U.S.C. § 1065. *Id.* at ¶ 12. Plaintiffs' Trademarks have been used exclusively and continuously by Plaintiffs, and have never been abandoned. *Id.* Plaintiffs' Trademarks are exclusive to the Plaintiffs, and are displayed extensively on Plaintiffs' Products and in Plaintiffs' marketing and promotional materials. *Id.* at ¶ 13.

Plaintiffs' Trademarks have achieved tremendous fame and recognition that has only added to the inherent distinctiveness of the marks. *Id.* at ¶ 14. As such, the goodwill associated with the Plaintiffs' Trademarks is of incalculable value to Plaintiffs. *Id.* Plaintiffs have received extensive editorial coverage and unsolicited press in various magazines and other publications throughout the world. *Id.* at ¶ 15. Plaintiffs' Products have been featured in numerous publications and magazines throughout the world. *Id.*

In addition to the Plaintiffs' Trademarks, Plaintiffs also owns federal copyright and common law copyrights to hundreds of original photographs and images (collectively "Plaintiffs' Copyrights") that they use to advertise Plaintiffs' Products. *Id.* at ¶ 17. Plaintiffs, Mon Cheri Bridals, LLC ("Mon Cheri") owns federal copyrights to hundreds of original photographs and images that Mon Cheri uses to advertise Mon Cheri bridal gowns and formalwear ("Mon Cheri Copyright"). *Id.* at ¶ 16. A genuine and authentic copy of United States Copyright Registration

6

No. VA 1-936-316 for the Mon Cheri Copyright is attached to the Lang Declaration as <u>Exhibit 4</u>. *Id.* The Mon Cheri Copyright is for original, copyrightable works of Mon Cheri. *Id.* at ¶ 17. Mon Cheri has complied with all statutory formalities and requirements in obtaining the Mon Cheri Copyright. *Id.* Plaintiffs extensively use photographs and images protected by the Mon Cheri Copyright and Plaintiffs' Copyrights in connection with the marketing of Plaintiffs' Products on their Websites. *Id.*

Sales of Plaintiffs' Products via the Websites represent a significant portion of Plaintiffs' business. *Id.* at ¶ 10. The Websites feature proprietary content, images and designs exclusive to Plaintiffs. *Id.* Furthermore, genuine Plaintiffs' Products are widely advertised, promoted, and offered for sale on the Websites primarily with original images owned by Plaintiffs' and protected by the Mon Cheri Copyright and Plaintiffs' Copyrights. *Id.* at ¶ 18.

Plaintiffs spend significant sums of money on Internet marketing and consumer education regarding their products, including search engine optimization ("SEO") strategies that allow Plaintiffs and others to fairly and legitimately educate consumers about the value associated with Plaintiffs' brands and the goods sold thereunder and the problems associated with counterfeiting and the unauthorized use of the Plaintiffs' Trademarks and Copyrights. *Id.* at ¶ 19. Defendants, through their operation of the Infringing Websites, engage in so-called "black hat" SEO strategies that involve the unlawful use of Plaintiffs' names and trademarks within the content, anchor text, and/or meta tags of the Infringing Websites in order to attract the automated eye of various search engines crawling the Internet looking for websites relevant to consumer searches for genuine Plaintiffs' Products. *Id.* at ¶ 20. Such illegal use results in unfair competition for Plaintiffs when competing for visibility on the Internet and deceives consumers into falsely believing they are buying legitimate Plaintiffs' Products from these sites. *Id.*

In recent years, the bridal dress and formalwear industry in the United States has been plagued by the onset of individuals and entities that unlawfully use the trademarks and goodwill built by Plaintiff and other manufacturers in this industry to sell cheap counterfeits of Plaintiffs' dresses. *Id.* at ¶ 21. Due to the proliferation of websites selling counterfeit dresses, Plaintiff retained the services of Counterfeit.Technology, a company that provides online policy enforcement technology focused on identifying websites selling Counterfeit Products. *Id.* Counterfeit.Technology uses a large web crawler coupled with sophisticated algorithms and detection models to identify counterfeit products offered for sale across the Internet. *Id.* at ¶ 22. Counterfeit.Technology collects content from websites and the software program's algorithms identify which of the websites are likely counterfeiters, using a combination of information supplied by the brand owners and inspecting characteristics on the Infringing Websites consistent with counterfeiting. *Id.*

II. **DEFENDANT'S UNLAWFUL CONDUCT CENTERS AROUND HIJACKING PLAINTIFFS' BRANDS TO DECEIVE CONSUMERS INTO PURCHASING IMITATION KNOCKOFFS FROM THE INFRINGING WEBSITES**

The primary way in which Defendants advertise the sale of Counterfeit Products on the Infringing Websites is by displaying one or more of the Plaintiffs' Trademarks and stealing Plaintiffs' original images that are protected by the Mon Cheri Copyright and Plaintiffs' Copyrights and that Plaintiffs use to market genuine Plaintiffs' Products. *Id.* at ¶¶ 23-26. In many instances, the images that Defendants steal from Plaintiffs' Websites and display on the Infringing Websites are identical to those protected by the Mon Cheri Copyright and Plaintiffs' Copyrights. *Id.* at ¶ 24. After reviewing the Counterfeit Products advertised for sale on the Infringing Websites, Plaintiffs confirmed that imitation knockoffs were being offered for sale to residents of the United States and the State of Illinois. *Id.* at ¶ 25. Plaintiffs also concluded that

the Infringing Websites are selling Counterfeit Product based on a visual inspection of the products as they appear on the Infringing Websites, the price at which the Counterfeit Products are being offered for sale, and because Defendants and the Infringing Websites do not conduct business with Plaintiffs and do not have the right or authority to use Plaintiffs' Trademarks, the Mon Cheri Copyright or Plaintiffs' Copyrights for any reason. *Id.* Defendants facilitate sales of Counterfeit Products by designing the Infringing Websites so that they appear to unknowing consumers to be authorized online retailers, outlet stores or wholesalers selling genuine Plaintiffs' Products and accept payment in U.S. Dollars. *Id.* at ¶ 26.

Due to nature of Defendants' illegal counterfeiting activities that involve stealing Plaintiffs' original images of genuine Plaintiffs' Products to advertise cheap knockoffs in violation of the Plaintiffs' Trademarks and Copyrights, monetary damages cannot adequately compensate Plaintiff for ongoing infringement because monetary damages fail to address the loss of control and damage to Plaintiffs' reputation and goodwill. *Id.* at ¶ 27. Furthermore, monetary damages are difficult, if not impossible, to ascertain due to the inability to calculate measurable damage in dollars and cents caused to Plaintiffs' reputation and goodwill by acts of infringement. *Id.* Plaintiffs' goodwill and reputation are irreparably damaged when Plaintiffs' Trademarks are used on goods not authorized, produced or manufactured by Plaintiffs. *Id.* at ¶ 28. This leads to brand confidence being damaged, resulting in loss of future sales and market share. *Id.* The extent of harm to Plaintiffs' reputation and goodwill and the possible diversion of customers due to loss in brand confidence are largely unquantifiable. *Id.* Defendants' illegal use of the Plaintiffs' Trademarks and Copyrights further irreparably harms Plaintiffs because counterfeiters like the Defendants take away Plaintiffs' ability to control the nature and quality of Counterfeit Products. *Id.* at ¶ 29. Loss of quality control over goods bearing the Plaintiffs' Trademarks and,

in turn, loss of control over Plaintiffs' reputation, is neither calculable nor precisely compensable. *Id.*

In an effort to further deceive consumers into purchasing Counterfeit Products, the Infringing Websites accept payment via Western Union, credit card and/or PayPal and ship the Counterfeit Products in small quantities via international mail to minimize detection by U.S. Customs and Border Protection. *See* Declaration of Suren Ter Saakov (the "Ter Saakov Declaration") at ¶ 6. Defendants further perpetuate the illusion of legitimacy by offering "live 24/7" customer service and using indicia of authenticity and security that consumers have come to associate with authorized retailers, including the McAfee® Security, VeriSign®, Visa®, MasterCard®, and PayPal® logos. *Id.* Defendants also deceive unknowing consumers by using the Plaintiffs' Trademarks without authorization within the content, text, and/or meta tags of their websites in order to attract various search engines crawling the Internet looking for websites relevant to consumer searches for Plaintiffs' Products. *Id.* at ¶ 7. Additionally, upon information and belief, Defendants use other unauthorized search engine optimization (SEO) tactics to increase website rank and spend several thousand dollars each month on pay-per-click advertising and other SEO optimization methods. *Id.* As a result, links to Defendants' websites show up at or near the top of popular search results and misdirect consumers searching for genuine Plaintiffs' Products. *Id.* The extent to which Defendants have engaged in these tactics and the resultant instances of trademark and copyright infringement to promote the sale of Counterfeit Products is substantial, as the total value of Defendants' collective traffic to the Infringing Websites (both organic traffic and paid traffic through pay-per-click advertising) is approximately $333,936.00 per month, which generates approximately 463,800 monthly visitors to the Infringing Websites and an estimated $1,855,200.00 in sales per month. *Id.* at ¶ 8.

Through their illegal operation of the Infringing Websites, **Defendants have infringed upon the Plaintiffs' Trademarks approximately 36,718,617 times, infringed upon the Mon Cheri Copyright 27,093 times, and infringed upon Plaintiffs' Copyrights approximately 2,340,464 times**. *Id.*

Defendants go to great lengths to conceal their identities and often use multiple fictitious names and addresses to register and operate the Infringing Websites. *Id.* at ¶ 9. Many of Defendants' names and addresses used to register the Infringing Websites are incomplete, contain randomly typed letters, or fail to include cities or states. *Id.* Other Infringing Websites use privacy services that conceal the owners' identity and contact information. *Id.* On information and belief, Defendants constantly register new websites using the identities listed in Schedule "A" to the Amended Complaint, as well as other unknown fictitious names and addresses. *Id.* The registration patterns of these websites are one of many tactics used by the Defendants to conceal both their identities and the full scope and interworking of Defendants' massive counterfeiting operation. *Id.* Another tactic commonly used by Defendants to thwart enforcement efforts is to constantly change the location to which the Infringing Websites redirect. *Id.* As such, Plaintiffs also seek an *ex parte* order to temporarily disable the Infringing Websites owned by Defendants that are the means by which the Defendants could continue to sell Counterfeit Products.

Even though Defendants operate under multiple fictitious names, many similarities between the Infringing Websites indicate a coordinated effort to sell Counterfeit Products. *Id.* at ¶ 10. For example, many of the Infringing Websites have virtually identical layouts, even though different aliases were used to register the respective domain names. *Id.* In addition, Counterfeit Products for sale in the Infringing Websites bear similar irregularities and indicia of being

11

counterfeit to one another, suggesting that the Counterfeit Products were manufactured by and come from a common source and that Defendants are interrelated. *Id.*

Plaintiffs' well-pleaded allegations in the Complaint and supporting declarations regarding patterns and similarities among the Infringing Websites establishes a logical relationship between the Defendants and that, on information and belief, Defendants are an interrelated group of counterfeiters. *Id.*; *see also* Amended Complaint at ¶ 12. On information and belief, Defendants are working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell Counterfeit Products in the same transaction, occurrence, or series of transactions or occurrences. *Id.* As indicated above, tactics used by Defendants to conceal their identities and the full scope of their counterfeiting operation make it virtually impossible for Plaintiff to learn Defendants' true identities and the exact interworking of their massive counterfeit network. Based on previous cases of domains that unlawfully use a brand owner's trademarks and copyrighted images to sell counterfeit products, when any advance notice of a lawsuit or request for injunctive relief is given to the owner or registrant of a website involved in counterfeiting, the requested relief is rendered ineffective and meaningless, because counterfeiters operate as a proverbial "moving target," beyond the effective reach of copyright owners, seeking to enforce their rights. *See* Ter Saakov Decl. at ¶¶ 11–13.

**ARGUMENT**

I.    DEFENDANTS ARE SUBJECT TO PERSONAL JURISDICTION OF THIS COURT BECAUSE THEY DIRECT THEIR BUSINESS ACTIVITIES TOWARDS RESIDENTS OF THE STATE OF ILLINOIS AND THIS JUDICIAL DISTRICT

"In federal question litigation, the statute upon which the action is based provides the rules for service of process on nonresident defendants." *Berthold Types Ltd. v. European Mikrograf Corp.*, 102 F.Supp.2d 928, 930 (N.D. Ill. 2010). In cases involving claims for trademark infringement, "the Lanham Act does not authorize national service of process. Therefore, the Illinois long-arm statute must be applied to determine if defendants are amenable to service of process." *Id.* Similarly, the Copyright Act does not authorize nationwide service. *Janmark, Inc. v. Reidy*, 132 F.3d 1200, 1201 (7th Cir. 1997), *abrogated on other grounds by Advanced Tactical Ordinance, LLC v. Real Action Paintball, Inc.*, 751 F.3d 796 (7th Cir. 2014). Illinois courts may properly assert jurisdiction over non-resident defendants when (1) jurisdiction is authorized under the Illinois long-arm statute; and (2) the minimum contacts required by due process are present. *Id.* (*citing FMC Corp. v. Varonos,* 892 F.2d 1308, 1310 (7th Cir.1990)). "The Illinois long-arm statute allows an Illinois court to exercise personal jurisdiction over nonresidents of Illinois on claims arising from, among other things, the 'transaction of any business within [Illinois],' and the "commission of a tortious act within [Illinois]." *Berthold Types*, 102 F.Supp.2d at 930 (*citing* 735 ILCS 5/2–209(a)(1)–(2)). The long-arm statute authorizes jurisdiction on any basis permitted by the Illinois Constitution and the Constitution of the United States. *Berthold Types* at 930; (*citing* 735 ILCS 5/2–209(c)). "Therefore, the statute authorizes the exercise of personal jurisdiction by the Illinois courts to the fullest constitutional limit, and the statutory analysis collapses into a two-prong analysis: one based on the Illinois Constitution, and one based on the federal Constitution." *Aero Products Int'l., Inc. v.*

*Intex Corp.*, No. 02 C 2590, 2002 WL 31109386, at *3 (N.D. Ill. Sept. 20, 2002) (*citing RAR,*

*Inc. v. Turner Diesel, Ltd.,* 107 F.3d 1272, 1276 (7th Cir. 1997).

In this case, Defendants target Illinois residents through their operation of the Infringing

Websites offering the sale of various Counterfeit Products in clear violation of Plaintiffs'

intellectual property rights. *See* Amended Complaint at ¶¶ 11, 18, 38. "When determining

whether a Plaintiffs have met his burden, jurisdictional allegations pleaded in the complaint are

accepted as true unless proved otherwise by defendants' affidavits or exhibits." *Purdue*

*Research Found. v. Sanofi-Sythelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). Thus, this Court

has personal jurisdiction over the Defendants because the requirements of the Illinois long-arm

statute have been satisfied and exercising personal jurisdiction over Defendants is consistent with

constitutional Due Process.

A.     Defendants' Operation of the Infringing Websites to Sell Counterfeit Products to
       Residents of the United States and Illinois Satisfies the Jurisdictional
       Requirements of the Illinois Long-Arm Statute

As an initial matter, the Lanham Act prohibits the use "in commerce" of any reproduction

or colorable imitation of a registered mark "in connection with the sale . . . distribution or

advertising of any goods or services on or in connection with which such use is likely to cause

confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1). In *Euromarket Designs,*

*Inc. v. Crate & Barrel Ltd.*, 96 F.Supp.2d 824, 831 (N.D. Ill. 2000), the court noted that the

United States Supreme Court has held that the "in commerce" requirement must be construed

liberally because the Lanham Act "confers broad jurisdictional powers upon the courts of the

United States." (*quoting Steele v. Bulova Watch Co.,* 344 U.S. 280, 283, 73 S.Ct. 252, 254, 97

L.Ed. 319 (1952)); *see also Planned Parenthood Fed'n of America, Inc. v. Bucci*, 42 U.S.P.Q.2d

1430, 1434 (S.D.N.Y. 1997), *aff'd,* 152 F.3d 920 (2d Cir. 1998), *cert. denied,* 525 U.S. 834, 119

S.Ct. 90, 142 L.Ed.2d 71 (1998) ("The nature of the Internet indicates that establishing a typical home page on the Internet, for access to all users, would satisfy the Lanham Act's 'in commerce' requirement."). "In considering whether defendant's alleged contacts meet the constitutional minimum, the Court will consider whether defendant has done some act or consummated some transaction with the forum state, or performed some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protection of its laws." *Watchworks, Inc. v. Total Time, Inc*., No. 01 C 5711, 2002 WL 424631, at *6 (N.D. Ill. Mar. 29, 2002) (*quoting Euromarket*.)

Here, the record establishes that Defendants are not only unlawfully using the Plaintiffs' Trademarks and stealing images protected by the Mon Cheri Copyright and Plaintiffs' Copyrights, but are doing so in an effort to deceive consumers into purchasing the Counterfeit Products advertised for sale on the Infringing Websites. Here, as in *Euromarket* and unlike in *Watchworks*, Defendant is intentionally stealing Plaintiffs' original photographs from the Websites to advertise the sale of imitation knockoffs bearing the Plaintiffs Trademarks. Plaintiffs are the exclusive owners of the Plaintiffs' Trademarks and Copyrights and has not authorized Defendants' willfully unlawful conduct in any way. Thus, Defendants' acts satisfy the general jurisdiction requirements of the Illinois long-arm statute.

B.    Exercising Personal Jurisdiction Over Defendants is Consistent with Constitutional Due Process

In *Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th Cir. 2010), the Court stated that "Specific personal jurisdiction is appropriate where (1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." (*citing Burger King v. Rudzewicz*, 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d

15

528 (1985)).  The exercise of specific personal jurisdiction must also comport with traditional notions of fair play and substantial justice as required by the Fourteenth Amendment's Due Process Clause.  *Id.* (*citing Int'l Shoe Co. v Washington,* 326 U.S. 310, 316 (1945)).  Illinois courts routinely exercise personal jurisdiction over websites unlawfully using registered trademarks in connection with the offering for sale and selling of counterfeit merchandise to Illinois residents over the Internet.  735 ILCS 5/2-209(a)(2).  *See, e.g., Illinois v. Hemi Group, LLC*, 622 F.3d 754, 757–58 (7th Cir. 2010) (finding defendant's contacts with Illinois satisfied due process where it "maintained commercial websites through which customers could purchase cigarettes, calculate their shipping charges using their zip codes, and create accounts"; defendant "stood ready and willing to do business with Illinois residents"); *Monster Energy Company v. Chen Wensheng*, et al., No. 15 C 4166, 2015 U.S. Dist. LEXIS 132283, at *11 (N.D. Ill. Sept. 29, 2015) (denying overseas counterfeiters' motion to dismiss because defendants' offer to sell counterfeit products through an Internet store establishes liability for trademark infringement, a tortuous act, because "defendants did not need to complete a sale to imbue Illinois courts with personal jurisdiction."); *Burberry Limited, et al. v. Weng Junpeng, et al.*, No. 15-cv-7994 (N.D. Ill. Oct. 2, 2015) (unpublished) ("[a] single tortious act committed in Illinois, no matter how minimal, brings the alleged tortfeasors within the scope of the long arm statute and thus demonstrates that personal jurisdiction is proper in Illinois").

Here, exercising personal jurisdiction over Defendants is reasonable because Defendants have intentionally created and operated the Infringing Websites to offer Counterfeit Products for sale and allow online orders from Illinois residents.  *See* Lang Decl. at ¶ 25.  Defendants have purposefully availed themselves of the privilege of doing business in Illinois and target their unlawful counterfeiting activities directly toward residents of this Judicial District.  *Id.*  Not only

could Defendants have reasonably foreseen being sued here, but they have specifically attempted to avoid being haled into this Court by hiding their identities and their assets. *See* Ter Saakov Decl. at ¶ 9. The record establishes that Defendants are committing tortious acts in Illinois by offering the sale of Counterfeit Products and have caused Plaintiff substantial injury in the State of Illinois. Thus, exercising personal jurisdiction over the Defendants in this matter not only satisfies the requirements of the Illinois long-arm statute but also comports with constitutional Due Process.

II.  PLAINTIFFS ARE ENTITLED TO AN *EX PARTE* TEMPORARY RESTRAINING ORDER TEMPORARILY DISABLING THE INFRINGING WEBSITES, TEMPORARILY RESTRAINING DEFENDANTS' ASSETS, EXPEDITING DISCOVERY AND ALLOWING SERVICE OF PROCESS BY EMAIL AND ELECTRONIC PUBLICATION

Plaintiffs seek an *ex parte* TRO pursuant to Fed. R. Civ. P. 65 and 15 U.S.C. § 1116, and this Court's inherent equitable authority to prevent the ongoing harm caused by Defendants' operation of the Infringing Websites to sell Counterfeit Products. The relief sought in the Temporary Restraining Order will maintain the *status quo* of this case, effectuate service of process upon all Defendants, and, most importantly, ensure that evidence of Defendants' misconduct is preserved and monetary profits gained therefrom temporarily restrained during the pendency of this action. Plaintiffs' requested relief is warranted.

In Illinois, the standards for issuing temporary restraining orders are identical to the standards for preliminary injunctions. *Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC*, 87 F.Supp.3d 874, 877 (N.D. Ill. 2015) (*citing Long v. Board of Educ., Dist. 128*, 167 F.Supp.2d 988 (N.D. Ill. 2001)); *Bernina of America, Inc. v. Fashion Fabrics Int'l, Inc.,* No. 01 C 585, 2001 WL 128164, at *1 (N.D. Ill. Feb.9, 2001). Thus, the party seeking the TRO bears the burden of showing: "(1) its case has some likelihood of success on the merits; (2) that

17

no adequate remedy at law exists; and (3) it will suffer irreparable harm if the injunction is not granted." *Long* at 988 (*quoting Ty, Inc. v. Jones Group, Inc.,* 237 F.3d 891, 895 (7th Cir.2001)). If the Court is satisfied that these three conditions have been met, then it must consider the harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied. *Id*. Finally, the Court must consider the potential effect on the public interest (non-parties) in denying or granting the injunction. *Id*. The Court then weighs all of these factors, "sitting as would a chancellor in equity," when it decides whether to grant the injunction. *Id.* (*quoting Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992)). This process involves engaging in what the Court has deemed "the sliding scale approach" – the more likely the plaintiff will succeed on the merits, the less the balance of harms need favor the Plaintiffs' position. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008) (*citing Abbott* at 11.) The sliding scale approach is not mathematical in nature, rather "it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Abbott* at 895–896. The greater the movant's likelihood of succeeding on the merits, the less the balancing of harms need be in his favor. *See Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 461 (7th Cir. 2000).

In this case, there is a very high likelihood that Plaintiffs will succeed on the merits. Defendants' operation of the Infringing Websites to deceive Illinois residents into purchasing Counterfeit Products in clear violation of Plaintiffs' trademark rights under 15 U.S.C. § 1114 (trademark infringement) and 15 U.S.C. § 1125(a) (false designation of origin). Moreover, Defendants con unknowing consumers into thinking they are purchasing original Plaintiffs' Products by stealing and reprinting Mon Cheri's copyrighted images on the Infringing Websites

protected by the Mon Cheri Copyright in violation of 17 U.S.C. § 501 (copyright infringement), and engaging in similar deceptive acts in or affecting commerce in Illinois by stealing and reprinting Plaintiffs' original images in violation of Plaintiffs' Copyrights (uniform deceptive trade practices). In this case, there is indisputable evidence that **Defendants have infringed upon the Plaintiffs' Trademarks approximately 36,718,617 times, infringed upon the Mon Cheri Copyright approximately 27,093 times, and infringed upon the Plaintiffs' Copyrights approximately 2,340,464 times**. *See* Ter Saakov Decl. at ¶ 8. Defendants unlawful conduct has resulted in monthly sales of roughly $1,855,200.00. *Id.* If the TRO is issued, no legitimate interest of Defendants will be harmed, and the effect on third parties such as the domain registrars and hosting providers from whom Defendants acquired the Infringing Websites will be negligible and short-lived. The public interest also weighs heavily in favor of relief because the same harm Defendants are inflicting upon the Plaintiffs are also being inflicted upon the general public. Therefore, the relief Plaintiffs are requesting is warranted.

A.  Plaintiffs are Likely to Succeed on the Merits of Their Claims for Trademark Infringement, False Designation of Origin, Cyberpiracy, Copyright Infringement and Uniform Deceptive Trade Practices

Plaintiffs are likely to succeed on the merits of their claims, and, as such, their request for a TRO should be granted. Plaintiffs' Complaint sets forth the following claims: (1) trademark infringement under the Lanham Act (15 U.S.C. § 1114); (2) false designation of origin under the Lanham Act (15 U.S.C. § 1125(a)); (3) copyright infringement under the Copyright Act (17 U.S.C. § 501); (4) cyberpiracy under the Anti-Cybersquatting Consumer Protection Act (15 U.S.C. § 1125(d)); and (5) uniform deceptive trade practices under 815 ILCS § 510, et seq. Defendants' unlawful acts are designed to intentionally deceive members of the general public, causing them confusion and causing them to mistakenly associate Plaintiffs with this activity.

There is no dispute about Defendants' illegal conduct and the law governing Plaintiffs' claims and the relief it seeks is clear.

### 1. Trademark Infringement and Counterfeiting

Section 1114(1) of the Lanham Act prohibits use of a reproduction, counterfeit, copy or "colorable imitation" of a registered mark in connection with the distribution of goods and services where such use is likely to cause confusion or mistake or to deceive. Furthermore, the Lanham Act also prohibits use of a trademark, any false designation of origin, false designation of fact or misleading representation of fact which:

> [I]s likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

15 U.S.C. § 1125(a); *see also* 15 U.S.C. §§ 1116(d) and 1127 (stating that a counterfeit mark as defined by the Lanham Act is a "spurious mark which is identical with, or substantially indistinguishable from, a registered mark" on the Principal Register of the United States Patent and Trademark Office, used by an unauthorized producer). To prove a prima facie case of infringement, Plaintiffs must show (1) their marks are distinctive enough to be worthy of protection; (2) Defendants are not authorized to use the Plaintiffs' Trademarks; and (3) Defendants' use of the Plaintiffs' Trademarks causes a likelihood of confusion as to the origin or sponsorship of Defendants' products. *See Neopost Industrie B.V. v. PFE Int'l Inc.*, 403 F. Supp. 2d 669, 684 (N.D. Ill. 2005) (citations omitted). Plaintiffs satisfy all three requirements of the Lanham Act to successfully bring a trademark infringement and counterfeiting claim.

In this case, Plaintiffs have established that it is the owner of all right, title and interest in and to the Plaintiffs' Trademarks in connection with imitation knockoffs being counterfeited by Defendants on the Infringing Websites. *See* Lang Declaration at ¶¶ 11-14. These registrations

are prima facie evidence of the validity of the Plaintiffs' Trademarks, as well as Plaintiffs' exclusive right to use their marks in commerce and in connection with the goods or services specified in the registrations. 15 U.S.C. § 1057(b).

Furthermore, Plaintiffs plainly satisfy the likelihood of confusion test. The Seventh Circuit has held that where "one produces counterfeit goods in an apparent attempt to capitalize upon the popularity of, and demand for, another's product, there is a presumption of a likelihood of confusion." *Microsoft Corp. v. Rechanik*, 249 F. App'x 476, 479 (7th Cir. 2007); *see also Monster Energy Co. v. Jing*, No. 15 C 277, 2015 WL 4081288, at *3 (N.D. Ill. July 6, 2015) ("Evidence of actual confusion is not required to prove likelihood of confusion . . ."); *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir. 1987) ("Where, as here, one produces counterfeit goods in an apparent attempt to capitalize upon the popularity of, and demand for, another's product, there is a presumption of a likelihood of confusion."). The Seventh Circuit has enumerated seven factors to determine whether there is a likelihood of confusion, which include: (1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of complainant's mark; (6) actual confusion; and (7) intent of the defendants to palm off their products as that of another. *Eli Lilly*, 233 F.3d at 461–462 (citation omitted). These factors are not a mechanical checklist, and "[t]he proper weight given to each of [the] factors will vary from case to case." *Black & Decker Corp. v. Positec USA Inc.*, No. 11–cv–5426, 2015 WL 1543262, at *29 (N.D. Ill. Mar. 31, 2015) (citing *Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*, 94 F.3d 376, 381 (7th Cir. 1996). At the same time, although no one factor is decisive, the similarity of the marks, the intent of the defendant, and evidence of actual confusion

are the most important considerations. *Eli Lilly* at 462 (*citing G. Heileman Brewing Co., Inc. v. Anheuser-Busch, Inc.*, 873 F.2d 985, 999 (7th Cir. 1989)); *Ty, Inc.*, 237 F.3d at 898.

Here, the Defendants are selling low-quality, counterfeit versions of products that, on their face, appear to be materially indistinguishable from genuine Plaintiffs' Products and use counterfeit marks **<u>identical</u>** to the Plaintiffs' Trademarks, establishing that the first and second factors weigh heavily in Plaintiffs' favor. With respect to area and manner of concurrent use, court looks to whether the parties used the same channels of commerce, targeted the same general audience, and/or used similar marketing. *CAE, Inc. v. Clean Air Eng'g Inc.*, 267 F.3d 660, 681 (7th Cir. 2001). Online sales of genuine Plaintiffs' Products constitute a significant portion of Plaintiffs' business. *See* Lang Decl. at ¶ 10. Similarly, the Infringing Websites sell Counterfeit Products exclusively through the Internet. Regarding the degree of consumer care, Plaintiffs sell genuine Plaintiffs' Products in more than 5500 retail outlets throughout the world. *Id.* at ¶ 7. "[W]hen a buyer class is mixed, the standard of care to be exercised by the reasonably prudent purchaser will be equal to that of the least sophisticated consumer in the class." *Trans Union LLC v. Credit Research, Inc.*, 142 F.Supp.2d 1029, 1043 (N.D. Ill. 2001). Given this diverse group of global consumers who are likely to be confused by Defendants' counterfeiting activities, this factor clearly weighs in Plaintiffs' favor. For the fifth factor, strength of the Plaintiffs' Trademarks, these marks distinctive when applied to the Plaintiffs' Products and signify to consumers that the products come from Plaintiff and are manufactured to Plaintiffs' high standards. *See* Lang Decl. at ¶¶ 14, 31. As noted above, actual confusion is not required to prove likelihood of confusion. *Monster Energy Co. v. Jing*, 2015 WL 4081288, at *3. However, there should be no doubt that Defendants' Counterfeit Products bearing identical Plaintiffs' Trademarks displayed on the Infringing Websites with Plaintiffs' original images protected by

the Mon Cheri Copyright and Plaintiffs' Copyrights is confusing consumers. This sixth factor also weighs heavily in Plaintiffs' favor. Similarly, Defendants' intent is clear: the evidence establishes that **Defendants have infringed upon the Plaintiffs' Trademarks approximately 36,718,617 times**. *See* Ter Saakov Decl. at ¶ 8; Lang Decl. at ¶ 23, Ex. 5. Defendants' are intentionally hijacking Plaintiffs' brands to swindle consumers. The false registration data they provide in an attempt to shield themselves from liability validates their intent. As such, Plaintiffs unequivocally satisfy the likelihood of confusion test. Thus, because Plaintiffs are likely to succeed on the merits of their claims arising under the Lanham Act, their request for a Temporary Restraining Order is warranted.

### 2. False Designation of Origin

A plaintiff bringing a false designation of origin claim under 15 U.S.C. § 1125(a) must show that: (1) the plaintiff has a protectable trademark; and (2) a likelihood of confusion will exist as to the origin of plaintiff's products. *All Star Championship Racing, Inc. v. O'Reilly Auto. Stores, Inc.*, 940 F.Supp.2d 850, 865 (C.D. Ill. 2013) (citing *Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F. 3d 427, 436 (7th Cir. 1999)). This is the same test that is used for determining whether trademark infringement has occurred under the Lanham Act. *See Neopost*, 403 F. Supp. 2d at 684–685. In order to satisfy the use-in-commerce requirement for a Lanham Act claim for false designation of origin, the infringing acts need not have actually taken place in commerce, but need only have an adverse effect on commerce; to that end, the use-in-commerce element is satisfied if a defendant uses a plaintiff's mark for the purpose of providing a service. *Slep-Tone Entertainment Corp. v. Sellis Enterprises, Inc.*, 87 F.Supp.3d 906 (N.D. Ill. 2015).

23

Because the Plaintiffs' Trademarks are registered marks, and Plaintiffs have established a likelihood of success on the merits of their trademark infringement and counterfeiting claim against Defendants as set forth in Section II.A.1, *supra*, Plaintiffs have also established a likelihood of success on the merits of their claim for false designation of origin.

### 3. Cyberpiracy

Plaintiffs are also likely to succeed on their claim for cyberpiracy against certain defendants identified in Schedule "A" to the Amended Complaint for their operation of the Infringing Websites that include Plaintiffs' Trademarks within the domain itself. Under the Anticybersquatting Consumer Protection Act of 1996 (ACPA), a party is liable in a civil action to the owner of a mark if it has a bad faith intent to profit from that mark and registers a domain name that is identical or confusingly similar to that mark. 15 U.S.C. § 1125(d)(1)(A)(i)–(ii). In such cases, in addition to other damages, "a court may order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark." 15 U.S.C. § 1125(d)(1)(C). One focus of the ACPA is to address counterfeit sellers who "register well-known marks to prey on consumer confusion by misusing the domain name to divert customers from the mark owner's site to the cybersquatter's own site . . . [and] target distinctive marks to defraud consumers." *Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 809 (6th Cir. 2004).

In order to state a claim under the ACPA, a plaintiff must allege that (1) it had a distinctive or famous mark at the time the domain name was registered; (2) the defendant registered, trafficked in, or used a domain name that is identical or confusingly similar to plaintiff's mark, and (3) the defendant had a bad faith intent to profit from that mark. *MasterCard Int'l Inc. v. Trehan*, 629 F.Supp.2d 824, 830 (N.D. Ill. 2009) (*citing Flentye v.*

*Kathrein*, 485 F.Supp.2d 903, 914 (N.D. Ill. 2007); *see also V'soske, Inc. v. Vsoske.com*, No. 00 CIV 6099(DC), 2001 WL 546567, at *6 (S.D.N.Y. May 23, 2001)). In order for a domain name to be confusingly similar, the spelling does not have to be the same, but can be identical in translation, pronunciation, and meaning or indistinguishable in appearance of a mark. *MasterCard* at 830.

The Plaintiffs' Trademarks are inherently distinctive and famous with consumers worldwide, particularly those consumers purchasing bridal gowns, social occasion dresses, and other formalwear. *See* Lang Decl. at ¶ 14. In view of this and the fact that the Plaintiffs' Trademarks are registered with the United States Patent and Trademark Office on the Principal Register, Plaintiffs are likely to succeed in showing that the Plaintiffs' Trademarks are distinctive and/or famous.

Courts have held that the registration of a domain name incorporating a trademark owner's mark and being used to sell counterfeit versions of the trademark owner's goods is a particularly egregious form of bad faith. *See*, *e.g.*, *Louis Vuitton Malletier & Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567, 584–85 (E.D. Pa. 2002). In the instant case, it is manifestly clear that certain defendants have acted with bad faith intent to profit from Plaintiffs' Trademarks. These defendants have incorporated some of Plaintiffs' Trademarks in the URLs of the Infringing Websites and in some instances have simply added a single letter or word like "cheap" or "dress to the domain. Furthermore, these defendants use the Plaintiffs' Trademarks and images protected by the Mon Cheri Copyright and Plaintiffs' Copyrights without any authorization whatsoever from the Plaintiffs' to sell Counterfeit Products, a clear violation of the Lanham Act and Copyright Act.

When dealing with domain names, a court must evaluate an allegedly infringing domain name in conjunction with the content of the website identified by the domain name. *MasterCard* at 830. Here, there can be no question that the Infringing Websites operated by certain defendants are identical or confusingly similar to the Plaintiffs' Trademarks. As noted above, Defendants design their websites so that they look like authorized online retailers or outlet stores selling genuine Plaintiffs' Products. *See* Ter Saakov Decl. at ¶¶ 6-7. Defendants use photographs protected by the Mon Cheri Copyright and Plaintiffs' Copyrights with detailed product descriptions (often copied and pasted directly from Plaintiffs' Websites). These particular Infringing Websites add a single letter or word to the domain as the sole distinguishing factor from the Websites. Thus, Plaintiffs are likely to succeed on their claim for cyberpiracy.

### 4. Copyright Infringement

The evidence establishes that Mon Cheri is likely to succeed on its claim for copyright infringement. Section 501(a) of Title 17 of the United States Code provides, in part, that "[a]nyone who violates . . . the exclusive rights of the copyright owner . . . is an infringer of the copyright." Plaintiffs are generally entitled to various remedies for infringement, including injunctions, monetary damages, costs and attorney's fees. 17 U.S.C. §§ 502, 504, 505. To establish a prima facie of copyright infringement, a plaintiff must prove two essential elements: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original. *Pickett v. Prince*, 52 F.Supp.2d 893, 900–01 (N.D. Ill. 1999) (*citing Feist Publications, Inc. v. Rural Tel. Serv.,* 499 U.S. 340, 361, 111 S.Ct. 1282 (1991); *see also Atari, Inc. v. North Am. Phillips Consumer Elecs. Corp.*, 672 F.2d 607, 614 (7th Cir. 1982). The registration of a copyright certificate creates a prima facie presumption of validity of a copyright. *See* 17 U.S.C. § 410(c). That presumption, however, is rebutted by evidence that disputes or rebuts the

plaintiff's prima facie case. *Runstadler Studios, Inc. v. MCM Ltd. Partnership*, 768 F.Supp. 1292 (N.D. Ill. 1991); *see also Mid America Title Co. v. Kirk,* 59 F.3d 719, 721 (7th Cir.1995). Similar to a claim for trademark infringement and counterfeiting, a moving party may obtain injunctive relief for copyright infringement upon demonstrating:  (1) some likelihood of success on the merits; and (2) absence of an adequate remedy at law; and (3) that it will suffer irreparable harm absent injunctive relief.  *JCW Investments, Inc. v. Novelty, Inc.*, 222 F.Supp.2d 1030, 1033 (N.D. Ill. 2002) (*citing Publications International, Ltd. v. Meredith Corp.*, 88 F.3d 473, 478 (7th Cir. 1996)).   Furthermore, where copyright infringement has been established, there is a presumption that such infringement constitutes irreparable injury.  *White v. Marshall*, 771 F.Supp.2d 952, 958 (E.D. Wis. 2011) (*citing Atari* at 607).

Here, Mon Cheri has shown it is the exclusive owner of the original, copyrighted materials Defendants are infringing and has complied with all statutory formalities and requirements in obtaining the Mon Cheri Copyright.  *See* Amended Complaint at ¶ 32; Lang Decl. at ¶ 17.   Mon Cheri extensively uses the photographs protected by the Mon Cheri Copyright in connection with the marketing of its bridal gowns and formalwear; moreover, it has not authorized the Defendants to reproduce or otherwise display these images in any form whatsoever.  *Id.* at ¶ 18.   In this case, Defendants are liable to Mon Cheri for copyright infringement as a result of Defendants stealing Mon Cheri's original photographs protected by the Mon Cheri Copyright and republishing them on the Infringing Websites, resulting in a total of approximately 27,093 instances of copyright infringement.  *See* Ter Saakov Decl. at ¶ 8; Lang Decl. at ¶ 24, Ex. 6.   When comparing the original photographs protected by the Mon Cheri Copyright against the stolen images on Defendants' Infringing Websites, there is no doubt that Mon Cheri has established a prima facie case of copyright infringement against Defendants.

Indeed, the overwhelming majority of the images are the **identical photographs** protected by the Mon Cheri Copyright. *Id.* Thus, Mon Cheri is likely to succeed on its claim for copyright infringement against Defendants and has no adequate remedy at law and is entitled to injunctive relief.

### 5. Illinois Uniform Deceptive Trade Practices

The purpose of the Illinois Uniform Deceptive Trade Practice Act is to enjoin "trade practices which confuse or deceive the consumer." *Popp v. Cash Station, Inc.,* 244 Ill.App.3d 87, 98, 613 N.E.2d 1150, 1156 (1st Dist.1992) (*quoting Greenberg v. United Airlines,* 206 Ill.App.3d 40, 46, 563 N.E.2d 1031, 1036 (1st Dist.1990)). Proof of a trademark infringement is sufficient to establish a violation of the Illinois Uniform Deceptive Trade Practices. *All Star Championship Racing, Inc. v. O'Reilly Auto. Stores, Inc.*, 940 F.Supp.2d 850, 871 (C.D. Ill. 2013). In Illinois, courts resolve unfair competition and deceptive trade practices claims "according to the principles set forth under the Lanham Act." *Spex, Inc. v. Joy of Spex, Inc.*, 847 F. Supp. 567, 579 (N.D. Ill. 1994). Illinois courts look to federal case law and apply the same analysis to state infringement claims. *Id.* at 579 (citation omitted). The determination as to whether there is a likelihood of confusion is similar under both the Lanham Act and the Illinois Uniform Deceptive Trade Practices Act. *Am. Broad. Co. v. Maljack Prods., Inc.*, 34 F. Supp. 2d 665, 680–681 (N.D. Ill. 1998). Because Plaintiffs have established a likelihood of success on the merits of their trademark infringement and copyright infringement claim against Defendants as set forth in Section II.A.1, *supra*, and the standard is the same under Illinois law, Plaintiffs have established a likelihood of success on the merits for their Illinois Uniform Deceptive Trade Practices Act claim.

On its face, this case involves Defendants' false advertising of Plaintiffs' Products on the Infringing Websites through their unlawful use of the Plaintiffs' Trademarks and Copyrights. However, Defendants' illegal scheme to hijack Plaintiffs' brands and deceive unknowing consumers has many more layers than what is visible to those duped into purchasing Counterfeit Products. Defendants unfairly and deceitfully compete with Plaintiffs through search engine optimization ("SEO") using counterfeits of the Plaintiffs' Trademarks. *See* Lang Decl. at ¶ 20. In recent years, Plaintiffs have spent significant amounts of money on its marketing strategy and consumer education efforts with the goal of increasing visibility on the Internet through search engines such as Google, Yahoo!, and Bing. *Id.* at ¶ 19. Plaintiffs' SEO strategy attempts to fairly and legitimately educate consumers about the Plaintiffs' brands so that consumers understand the value of Plaintiffs' Products and highlight counterfeiting of the Plaintiffs' Trademarks. *Id.* Defendants have not only hijacked Plaintiffs' brands by stealing the Plaintiffs' Trademarks and copyrighted images to sell Counterfeit Products, but they have compounded their illegal activities by engaging in "black hat" SEO strategies based upon their illegal use of the Plaintiffs' Trademarks and by creating a counterfeit marketplace in parallel to Plaintiffs' legitimate online marketplace. *Id.* at ¶ 20. Defendants use unauthorized knockoffs of the Plaintiffs' brand names and their trademarks within the content, anchor text, and/or meta tags of the Infringing Websites in order to attract the automated eye of various search engines crawling the Internet looking for websites relevant to consumer searches for Plaintiffs' Products. *Id.*; *see also* Ter Saakov Decl. at ¶ 7. Such illegal use results in unfair competition for Plaintiffs when competing for visibility on the Internet and deceives consumers into falsely believing they are buying legitimate Plaintiffs' Products from these sites. Lang Decl. at ¶ 20. Thus, the record

establishes that Plaintiffs are likely to succeed on their claim under the Illinois Uniform Deceptive Trade Practices Act.

    B.    <u>Defendants' Sale of Counterfeit Products Irreparably Harms Plaintiffs and there is No Adequate Remedy at Law</u>

The Seventh Circuit has "clearly and repeatedly held that damage to a trademark holder's goodwill can constitute irreparable injury for which the trademark owner has no adequate legal remedy." *Re/Max N. Cent., Inc. v. Cook*, 272 F.3d 424, 432 (7th Cir. 2001) (*citing Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 469 (7th Cir. 2000); *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1114 (7th Cir. 1997); *Wesley–Jessen Division of Schering Corp. v. Bausch & Lomb Inc.*, 698 F.2d 862, 867 (7th Cir. 1983). The law presumes that "injuries arising from trademark infringement are irreparable." *Abbott Labs* at 16. Irreparable injury "almost inevitably follows" when there is a high probability of confusion because such injury "may not be fully compensable in damages." *Helene Curtis Industries, Inc. v. Church & Dwight Co., Inc.*, 560 F.2d 1325, 1332 (7th Cir. 1977) (citation omitted). "It is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill, caused by such violations." *Abbott Labs* at 16. "The most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods." *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1092 (7th Cir. 1988). As such, monetary damages are likely to be inadequate compensation for such harm. *Ideal Indus., Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1026 (7th Cir. 1979).

Here, Plaintiffs have readily demonstrated they are suffering irreparable harm. They have demonstrated the substantial goodwill it has amassed in the Plaintiffs' Trademarks as well as the irreparable injury they are suffering from Defendants' operation of the Infringing Websites

that illegally display Plaintiffs' original images to pass off Counterfeit Products as genuine. *See* Lang Declaration at ¶¶ 25-29. Defendants have hijacked Plaintiffs' goodwill and reputation in a concerted effort to deceive consumers into buying the Counterfeit Products. In this regard, remedies at law, such as money damages, are inadequate to compensate for Plaintiffs' injuries that result from Defendants' illegal counterfeiting activities. Thus, Plaintiffs are entitled to the requested relief in the form of a Temporary Restraining Order.

      C.      <u>The Balance of Hardships Unequivocally Weighs in Plaintiffs' Favor</u>

Plaintiffs have established the required likelihood of success respecting Defendants' liability for trademark counterfeiting and unfair competition. This Court must balance Plaintiffs' clear harm from the denial of a Temporary Restraining Order against potential harm Defendants may suffer from granting an injunction that would not be cured by prevailing on the merits and recovering on the injunction bond that Plaintiffs are required to post. As established by the evidence, the harm to Plaintiffs is immeasurable and irreparable, whereas the potential harm to Defendants is virtually nonexistent.

As willful infringers, Defendants are entitled to little equitable consideration. "When considering the balance of hardships between the parties in infringement cases, courts generally favor the trademark owner." *Krause Int'l Inc. v. Reed Elsevier, Inc.*, 866 F. Supp. 585, 587-88 (D.D.C. 1994). This is because "[o]ne who adopts the mark of another for similar goods acts at his own peril since he has no claim to the profits or advantages thereby derived." *Burger King Corp. v. Majeed*, 805 F. Supp. 994, 1006 (S.D. Fla. 1992) (internal quotation marks omitted). Therefore, the balance of harms "cannot favor a defendant whose injury results from the knowing infringement of the plaintiff's trademark." *Malarkey-Taylor Assocs., Inc. v. Cellular Telecomms. Indus. Ass'n*, 929 F. Supp. 473, 478 (D.D.C. 1996). Balancing the harms "involves

a two-step process. First the court must assess the plaintiff's chance of success. Next it must balance the hardships in accordance with this determination." *Ty, Inc*. at 896; *citing Storck USA, L.P. v. Farley Cando Co.*, 14 F.3d 311, 314 (7th Cir. 1994).

Here, Defendants' continued unauthorized use by Defendants of the Plaintiffs' Trademarks on the Infringing Websites to advertise and promote the sale of the Counterfeit Products further threatens Plaintiffs' reputation through diminished goodwill and brand confidence, their ability to control the quality and appearance of products bearing the Plaintiffs' Trademarks, loss of exclusivity, and loss of future sales. The potential harm to Defendants, on the other hand, is purely monetary. Defendants have no legitimate interest whatsoever in selling Counterfeit Products or otherwise using the Plaintiffs' Trademarks and Plaintiffs' original images protected by the Mon Cheri Copyright and Plaintiffs' Copyrights without their permission. Thus, the balance of hardships decidedly tips in Plaintiffs' favor and warrants granting their request for equitable relief.

> D.     An Injunction is in the Public Interest

An injunction under the circumstances presented in this case is in the public interest because it will prevent consumer confusion and stop Defendants from violating federal trademark and copyright laws. Defendants knowingly deceive the public into thinking Defendants are operating the Infringing Websites with Plaintiffs' approval and endorsement. An injunction serves the public interest in this case "because enforcement of the trademark laws prevents consumer confusion." *Lettuce Entertain You Enters., v. Leila Sophia AR, L.L.C.*, 703 F.Supp.2d 777, 791 (N.D. Ill. 2010); *see also Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 459 (7th Cir. 2000). Federal courts have long held that "the trademark laws . . . are concerned not alone with the protection of a property right existing in an individual, but also with the protection of the public from fraud and deceit." *Stahly, Inc. v. M.H. Jacobs Co.,* 183

F.2d 914, 917 (7th Cir. 1950) (citations omitted); *see also Shashi, Inc. v. Ramada Worldwide, Inc.,* No. Civ.A. 7:05CV00016, 2005 WL 552593, at *4 (W.D. Va. Mar. 1, 2005) ("It is in the best interest of the public for the court to defend the integrity of the intellectual property system and to prevent consumer confusion").

In this case, the injury to the public is significant, and the injunctive relief that Plaintiff seeks is specifically intended to remedy that injury by dispelling the public confusion created by Defendants' illegal actions. The public has the right not to be confused and defrauded as to the source of the goods and services offered by Defendants, or as to the identity of the owner of trademarks and service marks used in connection with those goods. Unless Defendants' unauthorized use of the Plaintiffs' Trademarks is enjoined, the public will continue to be confused and misled by Defendants' conduct.

Therefore, Plaintiffs respectfully submit that granting their Motion for TRO is in the public interest.

## III.   THE EQUITABLE RELIEF PLAINTIFFS ARE SEEKING IS APPROPRIATE

In addition to this Court's inherent authority to issue injunctive relief, the Lanham Act authorizes courts to issue injunctive relief "according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark . . .". 15 U.S.C. § 1116(a). Furthermore, Fed. R. Civ. P. 65(b) provides that a court may issue a temporary restraining order without notice where facts show that the movant will suffer immediate and irreparable injury, loss, or damage before the adverse party can be heard in opposition. Moreover, under Fed. R. Civ. P. 65(d)(2)(C), this Court has the power to bind any third parties, such as domain name registries and financial institutions, who are in active concert

with the Defendants or who aid and abet Defendants and are given actual notice of the order. The facts in this case warrant such relief.

      A.    <u>Plaintiffs' Request for a Temporary Restraining Order Immediately Enjoining Defendants' Unauthorized and Unlawful Use of Plaintiffs' Trademarks and Copyrights is Appropriate</u>

Plaintiffs request an order requiring the Defendants to immediately cease all use of the Plaintiffs' Trademarks and images protected by the Plaintiffs' Copyrights on or in connection with all Infringing Websites. Such relief is necessary to stop the ongoing harm to the Plaintiffs' Trademarks, Mon Cheri Copyright, Plaintiffs' Copyrights, Plaintiffs' brand and associated goodwill, as well as harm to consumers, and to prevent the Defendants from continuing to benefit from their unauthorized use of Plaintiffs' intellectual property. The need for *ex parte* relief is magnified in today's global economy where counterfeiters can operate over the Internet anonymously. Plaintiffs are currently unaware of both the true identities and locations of the Defendants, as well as other websites operated by Defendants used to distribute Counterfeit Products.

Many courts have authorized immediate injunctive relief in similar cases involving the unauthorized use of trademarks and counterfeiting. Courts have authorized immediate injunctive relief after considering the public interest and Congressional intent behind the Lanham Act. *See, e.g.*, *Deckers Outdoor Corp. v. Chen Bing, et al.*, No. 1:15-cv-09212 (N.D. Ill. Oct. 28, 2015) (unpublished) (granting *ex parte* temporary restraining order including a temporary injunction, a temporary transfer of the defendant domain names, a temporary asset restraint, expedited discovery, and service of process by email and electronic publication); *River Light V, LP, et al. v. Yu Wen Peng, et al.*, No. 1:15-cv-08967 (N.D. Ill. Oct. 20, 2015) (unpublished) (same); *Monster Energy Co. v. The Partnerships, et al.*, No. 1:15-cv-09142 (N.D. Ill. Oct. 15, 2015)

(unpublished) (same); *Richemont Int'l, et al. v. Jing Mi Ling, et al.*, No. 1:15-cv-07482 (N.D. Ill. Sept. 8, 2015) (unpublished) (same); *PhD Marketing, Inc., et al. v. Dongguan Betos Electronic Co., et al.*, No. 1:15-cv-07660 (N.D. Ill. Sept. 10, 2015) (unpublished) (same); *Lululemon Athletica Canada, Inc. v. Zai Dao Li, et al.*, No. 1:15-cv-07721 (N.D. Ill. Sept. 15, 2015) (unpublished) (same); *Performance Health Systems, LLC v. Yongkang Union Indus. Co., Ltd., et al.,* No. 1:15-cv-07932 (N.D. Ill. Sept. 25, 2015) (unpublished) (same); *Burberry Ltd., et al. v. Weng Jungpeng, et al.*, No. 1:15-cv-07994 (N.D. Ill. Oct. 15, 2015) (unpublished) (same); *Luxottica Group S.p.A. v. Zhang Yufeng, et al.*, No. 1:15-cv-08245 (N.D. Ill. Sept. 30, 2015) (unpublished) (same); *River Light V, L.P., et al. v. Zhangyali, et al.*, No. 1:15-cv-05918 (N.D. Ill. July 10, 2015) (unpublished) (same); *Oakley, Inc. v. Zhang Yiyi, et al.,* No. 1:15-cv-05963 (N.D. Ill. July 16, 2015) (unpublished) (same); *Richemont Int'l SA, et al. v. Chen Mei, et al.*, No. 1:15-cv-05991 (N.D. Ill. July 17, 2015) (unpublished) (same); *Luxottica Group S.p.A. v. Chen Xiaomin, et al.*, No. 1:15-cv-06197 (N.D. Ill. July 27, 2015) (unpublished) (same); *Guru Demin Inc. d/b/a True Religion Brand Jeans*, No. 1:15-cv-06220 (N.D. Ill. July 23, 2015) (unpublished) (same); *Christian Dior Couture, S.A. v. Lei Liu, et al.*, No. 1:15-cv-06234 (N.D. Ill. July 27, 2015) (unpublished) (same); *Am. Bridal & Prom Indus. Ass'n, et al. v. affordablebridaldress.com, et al.*, No. 3-14-cv-2311-AET-LHG (D.N.J. Sept. 24, 2014) (unpublished) (same); *Sherri Hill, et al. v. John Doe 1 a/k/a Wang Qinghe*, No. 1:12-cv-3014 (S.D.N.Y. Apr. 18, 2012) (unpublished) (same); *Chanel, Inc. v. The Partnerships, et al.*, No. 2:11-cv-01508-APG-PAL (D. Nev. Sept. 26, 2011) (unpublished) (same); *Tiffany (NJ), LLC v. Liu Zheng, et al.*, No. 0-11-cv-60171-CMA (S.D. Fla. Feb. 2, 2011) (hereinafter, collectively referred to as the *The Counterfeit Website Cases*[1]); *see also Kraft Food Holdings, Inc. v. Helm*,

---

[1] Genuine and authentic copies of the unpublished decisions from *The Counterfeit Website Cases* are attached to the Declaration of Richard J. Holmes as <u>Exhibit 6</u>.

205 F. Supp. 2d 942, 956 (N.D. Ill. 2002) (granting preliminary injunction requiring defendant to "immediately" remove all references to version of plaintiff's mark, including removing all references "from metatags, metanames or any other keywords on his websites"); *U.S. v. Puerto Rico Sewer Authority*, No. 06-1624(PG), 2009 WL 1935851, at *2 (D.P.R. June 26, 2009) ("[t]he ex parte temporary restraining order is indispensable to the commencement of an action when it is the sole method of preserving a state of affairs in which the court can provide effective final relief.") (*quoting* 11 Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure* § 2951 at 500–501 (1973)).

In this case, Defendants' primary method of driving consumer traffic to the Infringing Websites and maximizing sales of the Counterfeit Products is through the unlawful use of the Plaintiffs' Trademarks and displaying stolen images protected by the Mon Cheri Copyright and Plaintiffs' Copyrights. Through their unlawful actions, Defendants have infringed upon the Plaintiffs' Trademarks approximately 36,718,617 times, infringed upon the Mon Cheri Copyright 27,093 times, and infringed upon the Plaintiffs' Copyrights approximately 2,340,464 times, generating estimated monthly sales of $1,855,200.00. *See* Ter Saakov Decl. at ¶ 8. Moreover, Defendants will not be harmed if they are enjoined from using Plaintiffs' Trademarks because minimal effort and cost would be involved in transferring the domain name to Plaintiffs' control, as discussed in Subsection B, *infra*. If immediate injunctive relief is granted, any inconvenience or confusion experienced by users trying to locate Plaintiffs' Websites will be minimized, a primary goal of the Lanham Act. In balancing the harms to the parties, any likelihood of harm to Defendants is significantly outweighed by the likelihood of harm to Plaintiffs if immediate injunctive relief is not issued. Thus, an order enjoining Defendants from

using any of the Plaintiffs' Trademarks and images protected by the Plaintiffs' Copyrights to promote their counterfeiting scheme is warranted.

      B.      <u>An Order Temporarily Transferring Infringing Websites to Plaintiffs' Control is Appropriate</u>

Plaintiffs also seek an order temporarily disabling the Infringing Websites and electronically publishing notice of this case to Defendants. Defendants involved in domain name litigation easily can and often will immediately set up a redirect for their website which essentially informs a search engine that the website being crawled has permanently moved to another domain and instructs the search engine to divert traffic to the other website. *See* Ter Saakov Declaration at ¶ 11. Accordingly, to preserve the status quo and ensure the possibility of eventual effective relief, courts in trademark cases involving domain names regularly grant the relief requested herein. *See, e.g., The Counterfeit Website Cases, supra; see also Deckers Outdoor Corp. v. P'sips and Unincorporated Assoc., No. 13 C 2167*, 2013 WL 1337616, at *9 (N.D. Ill. Mar. 27, 2013) ("Absent a transfer of domain names to the Plaintiff, the Defendants in this case may be able to evade the Court's restraining order by changing ownership of the domain name and continuing to operate their online marketplaces while this case is pending.").

In this case, it is highly likely if not altogether certain that Defendants will quickly and easily transfer ownership of the Infringing Websites upon receiving notice of this action unless they are enjoined from doing so. Indeed, Plaintiffs have submitted evidence of common tactics used by online counterfeiters like the Defendants to evade detection and accountability for their illegal acts. *See* Ter Saakov Decl. at ¶¶ 11–13. Thus, Plaintiffs respectfully request that an order requiring the relevant registries and/or registrars for the Infringing Websites to temporarily transfer ownership of the Infringing Websites to the Plaintiffs' control and place the Infringing Websites on registry lock be granted.

C.     An Order Preventing the Fraudulent Transfer of Assets is Appropriate

Under the Lanham Act, a successful plaintiff is entitled, "subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). Pursuant to this provision, Plaintiffs' Amended Complaint includes a request for an accounting of defendants' profits. *See* Amended Complaint, Prayer for Relief at ¶ 7[2]. As the Supreme Court has explained in the trademark context, "[t]he infringer is required *in equity* to account for and yield up his gains to the true owner . . . [P]rofits are then allowed as an equitable measure of compensation." *Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.*, 240 U.S. 251, 259, 36 S.Ct. 269, 60 L.Ed. 629 (1916); *see also Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 987 (11th Cir. 1995) ("A request for equitable relief [under the Lanham Act] invokes the district court's inherent equitable powers to order preliminary relief, including an asset freeze, in order to assure the availability of permanent relief."). Because "it is essential that the trial courts carefully fashion remedies which will take all the economic incentive out of trademark infringement, . . . courts must implement fully the requirement of § 1117(a)(1) [allowing plaintiff] to recover (1) defendant's profits . . ." *Playboy Enter., Inc. v. Baccarat Clothing Co*., 692 F.2d 1272, 1275 (9th Cir. 1982); *see also Monster Energy Co. v. The Partnerships, et al.*, No. 1:15-cv-09142, at p.5 (N.D. Ill. Oct. 22, 2015) (unpublished) (granting plaintiff's request for a prejudgment asset freeze in an action arising under the Lanham Act and stating "[t]o the extent that the restraint might be too broad, the defendants may file challenges to the scope of the TRO by submitting evidence that some or all of the money has other sources.").

---

[2] Under the liberal notice pleading rule, Plaintiffs are not required to state whether they seek only an equitable accounting of profits or delineate in detail the contours of its claims. Preliminary injunctive relief is appropriate where, as here, the Plaintiffs have "the option of seeking either statutory damages, actual damages, or an accounting and profits remedy" and seeks an accounting "in the alternative in its initial complaint." *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 996 (7th Cir. 2002).

38

Here, the record establishes that Defendants' sole purpose in operating the Infringing Websites is to hijack Plaintiffs' brands and goodwill in order to sell imitation knockoffs to unknowing consumers. Through their illegal operations, Defendants have infringed upon the Plaintiffs' Trademarks approximately 36,718,617 times, infringed upon the Mon Cheri Copyright 27,903 times, and infringed upon the Plaintiffs' Copyrights approximately 2,340,464 times. *See* Ter Saakov Decl. at ¶ 8. Based on the collective traffic that the Infringing Websites generate, the combined monthly sales is estimated to be $1,855,200.00. *Id.* Defendants have clearly profited from their illegal activities and Plaintiffs are therefore entitled to equitable relief restraining any funds from Defendants' ill-gotten counterfeiting operations. Thus, in order to fully implement to goal and requirements set forth in § 1117(a)(1), Plaintiffs are entitled to a prejudgment asset freeze in order to recover Defendants' profits as a form of equitable relief.

D.  Plaintiffs are Entitled to Expedited Discovery

The United States Supreme Court has held that "federal courts have the power to order, at their discretion, the discovery of facts necessary to ascertain their competency to entertain the merits." *Vance v. Rumsfeld*, No. 06 C 6964, 2007 WL 4557812, at *6 (N.D. Ill. Dec. 21, 2007) (*quoting Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978)). District courts have broad power to require early document production and to permit expedited discovery. Fed. R. Civ. P. 30(b); Fed. R. Civ. P. 34(b). Expedited discovery is frequently available when preliminary relief is sought. *Ellsworth Associates v. United States*, 917 F.Supp. 841, 844 (D.D.C. 1996). In cases where courts provide for expedited discovery, plaintiff should be required to demonstrate (1) irreparable injury; (2) some probability of success on the merits; (3) some connection between the expedited discovery and the avoidance of the irreparable injury; and (4) some evidence that the injury that will result without expedited

discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted. *Crown Crafts, Inc. v. Aldrich*, 148 F.R.D. 151, 152 (E.D.N.C. 1993) (*citing Notaro v. Koch,* 95 F.R.D. 403, 405 (S.D.N.Y. 1982)). In *Deckers Outdoor*, the Court used a "good cause" standard, in which the court may order discovery of any matter relevant to the subject matter involved in the action. *Deckers Outdoor* at *10. Because the defendants in *Deckers Outdoor* had gone to great lengths to conceal their identities and avoid detection, expedited discovery was appropriate to discover the defendants' bank accounts and to serve the financial institutions maintaining those bank accounts. *Id.*

In this case, Plaintiffs are being irreparably harmed by the manufacture, importation, offering for sale, distribution and sale of Counterfeit Products by Defendants driven largely by Defendants' illegal use of the Plaintiffs' Trademarks and stolen images protected by the Mon Cheri Copyright and Plaintiffs' Copyrights, thus satisfying the "good cause" standard warranting expedited discovery. Although Plaintiffs have learned some aspects of Defendants' counterfeiting activities, Plaintiffs do not yet know the following information with any certainty: the true identities of Defendants, the scope of Defendants' counterfeiting activities, the source and location of the Counterfeit Products, or where the proceeds from Defendants' counterfeiting activities have gone. Plaintiffs, therefore, need to ascertain this critical information from third parties who are assisting Defendants' illegal operations without delay. The discovery Plaintiffs request on an expedited basis in the Proposed Sealed Order has been precisely defined and carefully limited to include only what is essential to prevent further irreparable harm to Plaintiffs, namely information relating to Defendants' true identities and identification of various websites, third party registrars and hosting providers, and financial accounts used in conjunction with the sale of Counterfeit Products through the Infringing Websites. As described above,

40

Defendants are using third-party payment processors such as Visa®, MasterCard®, and PayPal®, which helps to increase their anonymity by interposing a third party between the consumer and Defendants. *See* Ter Saakov Decl. at ¶ 6. Without being able to discover Defendants' bank and payment system accounts, any asset restraint would be of limited value because Plaintiff would not know the entities upon whom to serve the order. Discovery of these financial accounts, coupled with Defendants' identities and information relating to Defendants' Infringing Websites and other illegal operations, will ensure that Plaintiffs obtain the appropriate relief to terminate these illegal activities and obtain an accounting of Defendants' profits pursuant to 15 U.S.C. § 1117(a). Plaintiffs are unaware of any reason that Defendants or third parties that are indirectly supporting these activities cannot comply with these expedited discovery requests without undue burden. Thus, Plaintiffs respectfully request an order for expedited discovery in this matter.

> E. <u>Service of Process by E-mail and Electronic Publication Is Warranted and Necessary in this Case because Defendants have Purposefully Concealed Their True Identities in Registering the Infringing Websites and Rely Primarily on Electronic Communications to Communicate with Registrars and Customers</u>

Fed. R. Civ. P. 4 provides flexibility governing the procedures for giving defendants notice of commencement of an action in order to eliminate unnecessary technicalities in the service of process. *See* C. Wright & A. Miller, *Federal Practice and Procedure* § 1061, at 261 (2d ed. 1987). Service via e-mail and electronic publication is appropriate when a defendant provides a false name and physical address information in their domain name in order to conceal their location and avoid liability for their unlawful conduct, when defendants rely primarily on electronic communications to communicate with their registrars and customers, demonstrating that electronic service would be a reliable means of apprising the defendants, and when the plaintiff is unable to determine the exact physical whereabouts or identities of the registrants of

41

the domain names being used to operate defendant's online marketplaces.  *Decker Outdoor* at *9. This is exactly the situation presented in the case at bar.

Here, just like the defendants in *Deckers Outdoor* and *The Infringing Website Cases*, the Defendants provide bogus information regarding their actual names and physical address in connection with registering the Infringing Websites.  *See* Holmes Decl. at ¶ 8; Ter Saakov Decl. at ¶ 9.  Indeed, such deceitful conduct perpetuates Defendants' unlawful scheme in operating the Infringing Websites to sell Counterfeit Products.  Thus, service by email and electronic publication is warranted under these circumstances.

Pursuant to Fed. R. Civ. P. 4(f)(3), Plaintiffs request an order allowing service of process by electronically publishing a link to the Complaint, Plaintiffs' Motion for TRO, and all other relevant documents Plaintiff filed upon commencing this action on a website to which the Infringing Websites that are transferred to Plaintiffs' control will redirect, and by sending an e-mail to the e-mail addresses identified in Schedule "A" to Plaintiffs' Amended Complaint that includes a link to said website.  Plaintiffs respectfully submit that the combination of providing notice via electronic publication and e-mail, along with any notice that Defendants receive from domain name registrars and payment processors, is reasonably calculated under all circumstances to apprise Defendants of the pendency of the action and afford them the opportunity to appear and present their objections to this action; moreover, an order allowing service of process solely via e-mail and electronic publication in this case will benefit all parties and the Court by ensuring that Defendants receive prompt notice of this action.  Absent the ability to serve the Defendants in this manner, Plaintiffs will almost certainly be left without the ability to pursue a final judgment.

Under Section 3.7.7.1 of the Registrar Accreditation Agreement established by the Internet Corporation for Assigned Names and Numbers ("ICANN"), an individual or entity that registers a domain name is required to provide "accurate and reliable contact details and promptly correct and update them during the term of the . . . registration, including . . . postal address." *See* Holmes Declaration at ¶ 4.  An investigation of the WHOIS information for each of the Infringing Websites for which registration information is available reveals that Defendants have ignored the applicable ICANN regulations and provided false physical address information to the domain name registrars in order to avoid full liability.  *Id.* at ¶ 5.  For example, many of Defendants' names and addresses used to register the Infringing Websites are incomplete, contain randomly typed letters, fail to include cities or states, or use a privacy service that conceals this information.  *Id.*  Identical contact information among multiple domain names also suggests that many of the aliases used to register the Infringing Websites are used by the same individual or entity.  *Id.*  Despite providing false physical addresses, the registrants of the Infringing Websites must generally provide an accurate e-mail address so that their registrars may communicate with them regarding issues related to the purchase, transfer, and maintenance of the various accounts. Moreover, it is necessary for merchants, such as the registrants of the Infringing Websites, who operate entirely online, to visit their online marketplace to ensure it is functioning and to communicate with customers electronically.  As such, it is far more likely that Defendants can be served electronically than through traditional service of process methods.

Although Plaintiffs are unable to determine the exact physical whereabouts or identities of the registrants of the Infringing Websites because Defendants provided false registration data for the Infringing Websites, Plaintiffs have good cause to suspect the registrants of the Infringing Websites are all residents of China.  The United States and the People's Republic of China are

both signatories to the Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters (the "Convention"). *Id.* at ¶ 6. The Hague Convention does not preclude service by email, and the declarations to the Hague Convention filed by China do not appear to expressly prohibit email service. *Id.* Additionally, according to Article 1 of the Hague Convention, the "convention shall not apply where the address of the person to be served with the document is not known." *Id.* As such, United States District Courts, including in this District, routinely permit alternative service of process notwithstanding the applicability of the Hague Convention. *See Title Trading Services USA, Inc. v. Kundu, et al.*, No. 3:14–cv–225–RJC–DCK, 2014 WL 4053571, at *2 (W.D.N.C. Aug. 15, 2014) ("Courts have interpreted Rule 4(f)(3) to allow for any means of service that provides reasonable assurance that the defendant will be provided notice of the lawsuit, and is not prohibited by an international agreement."); s*ee also In re LDK Solar Secs. Litig.*, No. C 07-05182 WHA, 2008 WL 2415186, at *2 (N.D. Cal. Jun. 12, 2008) (authorizing alternative means of service on Chinese defendants without first attempting "potentially fruitless" service through the Hague Convention's Chinese Central Authority); *Nanya Tech. Corp. v. Fujitsu Ltd.*, No. CIV 06-00025, 2007 WL 269087, at *6 (D. Guam Jan. 26, 2007) (noting that the Hague Convention, to which Japan is a signatory, did not prohibit e-mail service upon Japanese defendant); *Popular Enters., LLC v. Webcom Media Group, Inc.*, 225 F.R.D. 560, 562 (E.D. Tenn. 2004) (recognizing that, while "communication via e-mail and over the internet is comparatively new, such communication has been zealously embraced within the business community"). *See generally* Jeremy A. Colby, *You've Got Mail: The Modern Trend Towards Universal Electronic Service of Process*, 51 Buff. L. Rev. 337, 353 (2003) ("[I]n many instances, court must examine the Hague Convention to ascertain whether to permit electronic service of process. The advisory

44

committee's notes for F.R.C.P. 4(f)(3) confirm as much by stating that 'the court may direct a special method of service not explicitly authorized by international agreement if not prohibited by the agreement.").  As such, Plaintiffs respectfully request this Court's permission to serve Defendants via email and electronic publication.

Federal Rule of Civil Procedure 4(f)(3) allows this Court to authorize service of process by any means not prohibited by international agreement as the Court directs.  *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1014 (9th Cir. 2002).  In *Rio Properties,* the court held, "without hesitation," that e-mail service of an online business defendant "was constitutionally acceptable."  *Id.* at 1017.  The court reached this conclusion, in part, because the defendant conducted its business over the Internet, used e-mail regularly in its business, and encouraged parties to contact it via e-mail.  *Id.*  Similarly, other courts, including the Northern District of Illinois, have held that alternate forms of service pursuant to Rule 4(f)(3), including e-mail service, are appropriate and may be the only means of effecting service of process "when faced with an international ebusiness scofflaw." *Id.* at 1018; *e.g., The Counterfeit Website Cases*, *supra*; *see also MacLean-Fogg Co. v. Ningbo Fastlink Equip. Co., Ltd.*, No. 08 CV 2593, 2008 WL 5100414, at *2 (N.D. Ill. Dec. 1, 2008) (finding e-mail and facsimile service appropriate); *Popular Enters., LLC v. Webcom Media Group, Inc.*, 225 F.R.D. 560, 563 (E.D. Tenn. 2004) (*quoting Rio*, 284 F.3d at 1018) (allowing e-mail service); *New Eng. Merchants Nat'l Bank v. Iran Power Generation & Transmission Co.*, 495 F. Supp. 73, 81 (S.D.N.Y. 1980) ("[Iran's] conduct can only be interpreted as an intentional avoidance . . . of service of process in an effort to frustrate the instant suits.  Justice demands that a substitute form of service be formulated one calculated to provide defendants with adequate notice of the pendency and nature of the instant suits." (*citing World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980)); *Popular*

45

*Enters., LLC v. Webcom Media Group, Inc.*, 225 F.R.D. 560, 563 (E.D. Tenn. 2004) (quoting *Rio*, 284 F.3d at 1018) (allowing e-mail service). Plaintiffs submit that allowing service solely by e-mail and electronic publication in the present case is appropriate and comports with constitutional notions of due process, particularly given the decision by the registrants of the Infringing Websites to deceitfully conduct their Internet-based activities anonymously.

Furthermore, Rule 4 does not require that a party attempt service of process by other methods enumerated in Rule 4(f) before petitioning the court for alternative relief under Rule 4(f)(3). *Rio Props. v. Rio Intern. Interlink,* 284 F.3d 1007, 1014-15 (9th Cir. 2002). As the *Rio Properties* Court explained, Rule 4(f) does not create a hierarchy of preferred methods of service of process. *Id.* at 1014. To the contrary, the plain language of the Rule requires only that service be directed by the court and not be prohibited by international agreement. There are no other limitations or requirements. *Id.* Alternative service under Rule 4(f)(3) is neither a "last resort" nor "extraordinary relief," but is rather one means among several by which an international defendant may be served. *Id.* Email service is also the most reliable way of putting Defendants on notice of this action. Service by email would serve the interests of justice, not to mention the principles of fairness. Accordingly, the Court should grant Plaintiffs' leave to serve the Defendants with the Summons and Amended Complaint, as well as this Court's Order and supporting documents, via the email addresses listed in the Proposed Sealed Order.

## IV. A BOND SHOULD SECURE THE RELIEF PLAINTIFFS ARE SEEKING

The posting of security upon issuance of a temporary restraining order or preliminary injunction is vested in the Court's sound discretion. *Rathmann Grp. v. Tanenbaum*, 889 F.2d 787, 789 (8th Cir. 1989); Fed. R. Civ. P. 65(c). Because of the strong and unequivocal nature of Plaintiffs' evidence of counterfeiting, copyright infringement, and unfair competition, Plaintiffs

respectfully request that this Court require Plaintiffs to post a bond of no more than Ten Thousand Dollars (U.S.) and No Cents ($10,000.00).  *See*, *e.g.*, *The Counterfeit Website Cases, supra* (requiring plaintiffs to post a $10,000.00 bond); *see also Arkansas Best Corp. v. Carolina Freight Corp.*, 60 F.Supp.2d 517, 521 (W.D.N.C. 1999) ("[T]he district court is vested with wide discretion in determining the amount of an injunction bond and should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction or restraining order.")

Here, Plaintiffs have submitted unequivocal evidence of Defendants' unlawful activities involving counterfeiting, copyright infringement, cyberpiracy and unfair competition that will immediately and irreparably harm Plaintiff and the general public if such illegal conduct is not temporarily enjoined.  *See* Lang Decl. at ¶¶ 27–32; Exhibits 5–6.  It bears repeating that in this case, Defendants have collectively infringed upon the Plaintiffs' Trademarks 36,718,617 times, the Mon Cheri Copyright 27,903 times, and the Plaintiffs' Copyrights 2,340,464 times.  *Id.; see also* Ter Saakvo Decl. at ¶ 8.  Thus, Plaintiffs respectfully request that this Court require Plaintiffs to post a bond of no more than ten thousand dollars (U.S.) and no cents ($10,000.00) to secure the injunctive relief that Plaintiffs are seeking.

<u>CONCLUSION</u>

Defendants' counterfeiting operations are irreparably harming Plaintiffs' business, their brand and the general public.  Without entry of the requested relief, Defendants' operation of the Infringing Websites will continue to lead prospective purchasers and others to believe that Defendants' Counterfeit Products have been manufactured by or emanate from Plaintiffs, when in fact, they have not.  Therefore, entry of an *ex parte* order is necessary to protect Plaintiffs' trademark and copyright rights, to prevent further harm to Plaintiffs and the general public, and

47

to preserve the status quo. In view of the foregoing and consistent with precedent of this Judicial District, Plaintiffs respectfully request that this Honorable Court issue: (i) a Temporary Restraining Order against Defendants enjoining the manufacture, importation, distribution, offer for sale, and sale of the Counterfeit Products at issue on this application; (ii) an Order temporarily disabling the Infringing Websites including those located at Defendants' domain names containing Plaintiffs' trademarks, (iii) an Order temporarily restricting transfer of Defendants' assets to preserve Plaintiffs' right to an equitable accounting; (iv) an Order for expedited discovery allowing Plaintiffs to access, inspect, and copy Defendants' records relating to the manufacture, distribution, offer of sale, and sale of the counterfeit products and Defendants' financial accounts; and (v) an Order allowing service on Defendants by electronic mail and electronic publication. In view of the foregoing and consistent with established precedent from previous similar cases, Plaintiffs respectfully request that this Court enter a Temporary Restraining Order in the form submitted herewith.

Dated this 4th day of January, 2016.       Respectfully submitted,

                                  s/ Richard J. Holmes
                                 Richard J. Holmes
                                 818 Water Wheel Court
                                 Charlotte, North Carolina 28209
                                 872.216.4104
                                 legal@counterfeittechnology.com

*Counsel for American Bridal and Prom Industry Association, Inc., Allure Bridals, Inc., Alyce Designs, Inc., Jovani Fashion, Ltd., La Femme Boutique, Inc., Mon Cheri Bridals, LLC, Mori Lee, LLC, Next Century Productions, Inc. d/b/a "Sydney's Closet", and Promgirl, LLC*