IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

AMERICAN BRIDAL AND PROM INDUSTRY ASSOCIATION, INC., ALLURE BRIDALS, INC., ALYCE DESIGNS, INC., JOVANI FASHION, LTD., LA FEMME BOUTIQUE, INC., MON CHERI BRIDALS, LLC, MORI LEE, LLC, NEXT CENTURY PRODUCTIONS, INC. d/b/a "SYDNEY'S CLOSET, and PROMGIRL, LLC,

Plaintiffs,

v.

SHEN CHEN, et al.,

Defendants.

Case No. 1:16-cv-00023

**Judge John Robert Blakey**

**Magistrate Judge Susan E. Cox**

**DECLARATION OF STEPHEN LANG**

I, Stephen Lang, of New York, New York, declare as follows:

1. I am over 18 years of age. I have personal knowledge of the facts set forth herein. I make this declaration in support of Plaintiffs' *Ex Parte* Motion for Entry of Temporary Restraining Order (the "*Ex Parte* Motion for TRO") and, if called as a witness, I could and would competently testify as follows:

2. I am the President of American Bridal and Prom Industry Association, Inc. ("ABPIA"). I am also the CEO of Mon Cheri Bridals, LLC ("Mon Cheri"), which is one of the world's largest manufacturers of formal apparel such as bridal gowns and social occasion dresses. Mon Cheri is a member of ABPIA.

3. ABPIA is a not for profit corporation organized under New Jersey law. ABPIA maintains its principal place of business at 1018 Whitehead Road Extension, Trenton, New Jersey 08638. ABPIA is organized exclusively as a business league or trade association for the

formalwear industry within the meaning of Section 501(c)(6) of the Internal Revenue Code of 1986. The purposes of ABPIA are as follows:

- to take any and all appropriate and lawful action against the marketing and sale of counterfeit formalwear products;
- to educate consumers, retailers and members of the formal industry and the general public about the harm to consumers and fair competition in the formalwear industry caused by the marketing and sale of counterfeit products;
- to lobby governmental entities to aid the formalwear industry in the fight against the marketing and sale of counterfeit products; and
- to conduct discussions among members of the formalwear industry respecting best practices to combat the marketing and sale of counterfeit products.

4. ABPIA represents the interests of many of the members of the formalwear industry. All of the Plaintiffs named in the Complaint in this action are members of ABPIA.

5. As President of ABPIA, and as an active member of the formalwear industry for over 30 years, I am familiar with the dresses and other formalwear manufactured and sold by the members of ABPIA. I started my career working for Gulf & Western in the early 1980's, and became the Vice President of Sales & Marketing for Alfred Angelo, a bridal company, in 1983. Later in the 1980's, I took a position as Vice President of Merchandising for Bridal Originals, a company engaged in the business of selling bridal gowns, mother-of-the-bride dresses and other formalwear. In the early 1990's, I started my own company, Mon Cheri Bridals, LLC.

6. Since starting Mon Cheri in the early 1990s, the company has grown to be one of the largest manufacturers and wholesalers of bridal gowns and formalwear throughout the world. All of the Plaintiffs named in the lawsuit are, like Mon Cheri, manufacturers of unique bridal

gowns and formalwear. Plaintiffs employ their own teams of dress designers, and invest substantial sums of money in the development of designs which fit their own branding strategies.

7. Each year, Mon Cheri and the other Plaintiffs invest millions of dollars in advertising their own unique dress designs. Plaintiffs' bridal gowns and formalwear are not only commercially available for sale throughout the country, but they are pictured in catalogs distributed throughout the country and overseas to retailers and others. Today, Plaintiffs' gowns are sold in approximately 5500 retail stores throughout the United States and throughout the world. The pictures used to advertise and market these gowns are the original works of the Plaintiffs and licensed only to authorized distributors.

8. Plaintiffs are internationally recognized manufacturers, distributors and retailers of bridal gowns and formalwear, all of which are marketed and sold under their federally registered trademarks (collectively, the "Plaintiffs' Products"). Plaintiffs' Products have become enormously popular and even iconic, driven by Plaintiffs' arduous quality standards and innovative design. Among the purchasing public, genuine Plaintiffs' Products are instantly recognizable as such. In the United States and around the world, Plaintiffs' brands have come to symbolize high quality, and Plaintiffs' Products are among the most recognizable formalwear in the world.

9. Because Plaintiffs are manufacturers and retailers of unique bridal gowns and formalwear, they employ their own team of dress designers, and invest significant sums of money in the development of designs that fit their own branding strategies. Among Plaintiffs' most important assets is the intellectual property associated with their brands.

10. Plaintiffs own and maintain several websites where they promote and sell genuine Plaintiffs' Products to consumers (collectively "Websites"). Sales of Plaintiffs' Products via the

Websites represent a significant portion of Plaintiffs' business. The Websites feature proprietary content, images and designs exclusive to Plaintiff. A genuine and authentic copy of a portion of the Plaintiffs' Websites is attached hereto as **Exhibit 1**.

11. Plaintiffs incorporate a variety of distinctive marks in the design of Plaintiffs' Products. As a result of their longstanding use, Plaintiffs own common law trademark rights in the Plaintiffs' Trademarks. The Plaintiffs' Trademarks are also registered with the United States Patent and Trademark Office. Plaintiffs' Products typically include at least one of the Plaintiffs' Trademarks. Plaintiffs use the following trademarks in connection with the advertising and marketing of their bridal gowns and formalwear:

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| 3,958,778 | ALLURE BRIDALS | May 10, 2011 | 25: BRIDAL GOWNS; BRIDAL DRESSES; BRIDESMAID DRESSES; PROM DRESSES; COCKTAIL AND EVENING WEAR, NAMELY, EVENING GOWNS, DRESSES, SKIRTS, BLOUSES AND JACKETS |
| 3,939,702 | EXCLUSIVE BRIDALS | April 5, 2011 | 25: BRIDAL GOWNS; BRIDAL DRESSES; BRIDESMAID DRESSES; PROM DRESSES; COCKTAIL AND EVENING WEAR, NAMELY, EVENING GOWNS, DRESSES, SKIRTS, BLOUSES AND JACKETS |
| 4,074,571 | NIGHT MOVES | December 20, 2011 | 25: BRIDAL GOWNS; BRIDAL DRESSES; BRIDESMAID DRESSES; PROM DRESSES; COCKTAIL AND EVENING WEAR, NAMELY, EVENING |

| | | | |
|---|---|---|---|
| | | | GOWNS, DRESSES, SKIRTS, BLOUSES AND JACKETS |
| 2,827,399 | JOVANI | March 30, 2004 | 25: WOMEN'S CLOTHING, NAMELY, FORMAL WOMEN'S WEAR, NAMELY, EVENING GOWNS, COCKTAIL DRESSES; AFTERNOON WEAR, NAMELY, SHIRTS, SKIRTS, PANTS, JACKETS, BLAZERS; CASUAL WEAR, NAMELY, BLOUSES, PANTS, T-SHIRTS, SHORTS, SKIRTS, JACKETS; BRIDAL GOWNS AND DRESSES, BRIDE'S MAID DRESSES, MOTHER OF THE BRIDE DRESSES, PROM GOWNS AND DRESSES, PAGEANT DRESSES, SPECIAL OCCASION DRESSES, SUITS, BLOUSES, TOPS, WRAP-AROUNDS, AND WRAPS |
| 4,116,887 | JVN | March 27, 2012 | 25: WOMEN'S CLOTHING, NAMELY, FORMAL AND CASUAL SEPARATES IN THE NATURE OF JACKETS, BLAZERS, PANTS, SHORTS, TOPS, BLOUSES, VESTS, SHRUGS, DRESSES AND JUMPSUITS |
| 4,255,978 | JOVANI | December 11, 2012 | 25: WOMEN'S SHOES |
| 4,000,319 | LA FEMME | July 26, 2011 | 25: CLOTHING, NAMELY, DRESSES, EVENING DRESSES AND GOWNS, EVENING TOPS, SKIRTS, AND SLACKS, WEDDING |

| | | | |
|---|---|---|---|
| | | | DRESSES AND GOWNS, BRIDESMAID DRESSES, PAGEANT DRESSES, PROM DRESSES, COCKTAIL DRESSES, AND SUITS |
| 2,596,028 | CAMERON BLAKE | July 16, 2002 | 25: BRIDAL DRESSES AND SOCIAL OCCASION DRESSES |
| 3,341,157 | JAMES CLIFFORD COLLECTION | November 20, 2007 | 25: BRIDAL GOWNS; EVENING, SOCIAL OCCASION, BRIDESMAIDS AND FLOWER GIRL APPAREL, NAMELY, GOWNS AND DRESSES |
| 2,484,508 | LE GALA BY MON CHERI | September 4, 2001 | 25: BRIDAL DRESSES AND SOCIAL OCCASION DRESSES |
| 3,447,055 | SOPHIA TOLLI | June 10, 2008 | 25: EVENING GOWNS, DRESSES FOR SOCIAL OCCAIONS, BRIDESMAID DRESSES, DRESSES FOR FLOWER GIRLS |
| 3,844,447 | ANGELINA FACCENDA | September 7, 2010 | 25: CLOTHING, NAMELY, BRIDAL WEAR IN THE NATURE OF DRESSES, WEDDING DRESSES AND BRIDESMAID DRESSES |
| 3,824,025 | BLU | July 27, 2010 | 25: CLOTHING, NAMELY, DRESSES, WEDDING DRESSES |
| 4,104,032 | FLAUNT BY MADELINE GARDNER | February 28, 2012 | 25: CLOTHING, NAMELY, DRESSES |
| 3,942,663 | JULIETTA | April 12, 2011 | 25: CLOTHING, NAMELY, DRESSES, WEDDING DRESSES |
| 3,827,188 | MADELINE GARDNER NEW YORK | August 3, 2010 | 25: CLOTHING, NAMELY, DRESSES, WEDDING DRESSES, BRIDESMAID DRESSES |
| 3,824,031 | MORI LEE BY MADELINE GARDNER | July 27, 2010 | 25: CLOTHING, NAMELY, DRESSES, WEDDING DRESSES, |

| | | | |
|---|---|---|---|
| | | | BRIDESMAID DRESSES |
| 3,882,191 | PAPARAZZI | November 30, 2010 | 25: CLOTHING, NAMELY, DRESSES |
| 4,110,893 | PAPARAZZI BY MADELINE GARDNER | March 13, 2012 | 25: CLOTHING, NAMELY, DRESSES |
| 4,132,777 | PRINCESITA DE VIZCAYA | April 24, 2012 | 25: CLOTHING, NAMELY, DRESSES |
| 4,160,191 | RONALD JOYCE | June 19, 2012 | 25: CLOTHING, NAMELY, DRESSES |
| 3,770,814 | STICKS AND STONES | April 6, 2010 | 25: CLOTHING, NAMELY, DRESSES, PARTY DRESSES, AND COCKTAIL DRESSES |
| 4,246,806 | VENI INFANTINO | November 20, 2012 | 25: CLOTHING, NAMELY, DRESSES |
| 4,160,190 | VICTORIA JANE | June 19, 2012 | 25: CLOTHING, NAMELY, DRESSES |
| 3,770,810 | VIZCAYA | April 6, 2010 | 25: CLOTHING, NAMELY, DRESSES |
| 3,888,607 | VOYÁGE | December 14, 2010 | 25: CLOTHING, NAMELY, DRESSES, WEDDING DRESSES |
| 3,737,267 | PROM CRAZY | January 12, 2010 | 25: CLOTHING, NAMELY, DRESSES, SHIRTS, SKIRTS, PANTS, PANT SUITS, SUITS, BLOUSES, LEGGINGS JEANS, VESTS, SWEATERS, SWIMSUITS, COVER UPS, SARONGS, SWEATSHIRTS, SWEATPANTS, TENNIS AND GOLF DRESSES, SHORTS, WARM-UP SUITS, RAINWEAR, CAPES, PONCHOS, HATS, BASEBALL CAPS, VISORS, SCARVES, SHAWLS, BELTS, JUMPSUITS, GLOVES, MITTENS, SHOES, BOOTS, SNEAKERS, SANDALS, OVERALLS, APRONS, NECKTIES, BOW TIES, SUSPENDERS, |

| | | | |
|---|---|---|---|
| | | | CUMMERBUNDS, JACKETS, COATS, SHAWLS, TANK TOPS, T-SHIRTS, SLEEPWEAR, LINGERIE, HOSIERY, AND GARTERS FOR MEN AND WOMEN |
| 3,190,731 | SYDNEY'S CLOSET | January 2, 2007 | 25: CLOTHING IN THE NATURE OF LADIES', CHILDREN'S AND TEEN CLOTHING, NAMELY, DRESSES, SHIRTS, SKIRTS, PANTS, SUITS, BLOUSES, LEGGINGS, JEANS, VESTS, SWEATERS, SWIMSUITS, COVER UPS, SARONGS, SWEATSHIRTS, SWEATPANTS, TENNIS/GOLF DRESSES, WARM-UP SUITS, RAINWEAR, CAPES, PONCHOS, HATS, SCARVES, SHAWLS, BELTS, JUMPSUITS, GLOVES, MITTENS, SHOES, BOOTS, SNEAKERS, OVERALLS, APRONS, NECKTIES, BOW TIES, AND SUSPENDERS, JACKETS, COATS, TANK TOPS, UNDERWEAR, BRAS, PANTIES, GARTER BELTS, WEDDING DRESSES, WEDDING GOWNS, AND T-SHIRTS |
| 3,325,341 | WE SIZE UP GLAMOUR | October 30, 2007 | 25: CLOTHING IN THE NATURE OF LADIES', CHILDREN'S AND TEEN CLOTHING, NAMELY, DRESSES, SHIRTS, SKIRTS, PANTS, SUITS, BLOUSES, LEGGINGS, JEANS, VESTS, SWEATERS, SWIMSUITS, |

| | | | |
|---|---|---|---|
| | | | COVER UPS, SARONGS, SWEATSHIRTS, SWEATPANTS, TENNIS/GOLF DRESSES, WARM-UP SUITS, RAINWEAR, CAPES, PONCHOS, HATS, SCARVES, SHAWLS, BELTS, JUMPSUITS, GLOVES, MITTENS, SHOES, BOOTS, SNEAKERS, OVERALLS, APRONS, NECKTIES, BOW TIES, AND SUSPENDERS, JACKETS, COATS, TANK TOPS, UNDERWEAR, BRAS, PANTIES, GARTER BELTS, WEDDING DRESSES, WEDDING GOWNS, AND T-SHIRTS |
| 4,476,945 | ALWAYS WEAR YOUR INVISIBLE CROWN | February 4, 2014 | 25: BALL GOWNS; BODICIES; BOTTOMS; BRIDESMAID DRESSES; DRESSES; EVENING DRESSES; EVENING GOWNS; FLIP FLOPS; FOOTWEAR; FOOTWEAR FOR WOMEN; FOOTWEAR NOT FOR SPORTS; FOOTWEAR, NAMELY, PUMPS; GLOVES; GLOVES FOR APPAREL; HEELS; KAFTANS; KNIT DRESSES; PUMPS; SANDALS; SANDALS AND BEACH SHOES; SASHES; SHAPEWEAR, NAMELY, BRAS, CAMIS, BODY SHAPER; SHAWLS; SHAWLS AND HEADSCARVES; SHAWLS AND STOLES; SHOES; SHOULDER SCARVES; SHOULDER |

| | | | |
|---|---|---|---|
| | | | WRAPS; SHOULDER WRAPS FOR CLOTHING; STILETTO HEELS; STOLES; STRAPLESS BRAS; STRAPS FOR BRAS; UNDER GARMENTS; UNDERARM CLOTHING SHIELDS; UNDERCLOTHES; UNDERCLOTHING; UNDERGARMENT ACCESSORIES, NAMELY, REMOVABLE SILICONE BUTTOCK ENHANCER PADS; UNDERGARMENTS; UNDERGARMENTS, NAMELY, WASPIES; UNDERWEAR; WOMEN'S CLOTHING, NAMELY, SHIRTS, DRESSES, SKIRTS, BLOUSES; WOMEN'S SHOES; WOMEN'S TOPS, NAMELY, CAMIS; WOMEN'S UNDERWEAR; WOVEN OR KNITTED UNDERWEAR |
| 3,346,348 | CLARISSE | November 27, 2007 | 25: WOMEN'S CLOTHING, NAMELY, FORMAL WOMEN'S WEAR, NAMELY, EVENING GOWNS, COCKTAIL DRESSES; BRIDAL GOWNS AND DRESSES, BRIDE'S MAIDS DRESSES, MOTHER OF THE BRIDE DRESSES, PROM GOWNS AND DRESSES, PAGEANT DRESSES, SPECIAL OCCASION DRESSES |
| 4,601,335 | KEEP CALM AND | September 9, 2014 | 25: BALL GOWNS; |

| | | | |
|---|---|---|---|
| | THINK PROM | | BODICIES; BOTTOMS; BRIDESMAID DRESSES; DRESSES; EVENING DRESSES; EVENING GOWNS; FLIP FLOPS; FOOTWEAR; FOOTWEAR FOR WOMEN; FOOTWEAR NOT FOR SPORTS; FOOTWEAR, NAMELY, PUMPS; GLOVES; GLOVES FOR APPAREL; HEELS; KAFTANS; KNIT DRESSES; PUMPS; SANDALS; SANDALS AND BEACH SHOES; SASHES; SHAPEWEAR, NAMELY, BRAS, CAMIS, BODY SHAPER; SHAWLS; SHAWLS AND HEADSCARVES; SHAWLS AND STOLES; SHOES; SHOULDER SCARVES; SHOULDER WRAPS; SHOULDER WRAPS FOR CLOTHING; STILETTO HEELS; STOLES; STRAPLESS BRAS; STRAPS FOR BRAS; UNDER GARMENTS; UNDERARM CLOTHING SHIELDS; UNDERCLOTHES; UNDERCLOTHING; UNDERGARMENT ACCESSORIES, NAMELY, REMOVABLE SILICONE BUTTOCK ENHANCER PADS; UNDERGARMENTS; UNDERGARMENTS, NAMELY, WASPIES; UNDERWEAR; WOMEN’S CLOTHING, NAMELY, SHIRTS, |

| | | | |
|---|---|---|---|
| | | | DRESSES, SKIRTS, BLOUSES; WOMEN'S SHOES; WOMEN'S TOPS, NAMELY, CAMIS; WOMEN'S UNDERWEAR; WOVEN OR KNITTED UNDERWEAR |
| 4,109,452 | PROMGIRL | March 6, 2012 | 25: DRESS SHIRTS; DRESS SUITS; DRESSES; DRESSING GOWNS; EVENING DRESSES; EVENING GOWNS; FOOTWEAR, NAMELY, PUMPS; GOWNS; PUMPS; SHOES; TOPS; WOMEN'S SHOES |
| 4,479,855 | SIMPLY DRESSES | February 11, 2014 | 25: BALLROOM DANCING SHOES; BODY SHAPERS; BODY STOCKINGS; BODY SUITS; BRAS; CAFTANS; CAMISETTES; CAMISOLES; FLIP FLOPS; FOOTWEAR; FOOTWEAR FOR WOMEN; FOOTWEAR, NAMELY, PUMPS; FOUNDATION GARMENTS WORN AROUND THE MIDSECTION OR THIGHS TO KEEP THE STOMACH IN AND CREATE A SLIMMING EFFECT; G-STRINGS; GIRDLES; GOWNS; HEADWEAR; HEADBANDS; HEELS; HOSIERY; KNEE-HIGH STOCKINGS; LADIES' UNDERWEAR; LEG SHAPERS; LEOTARDS; LINGERIE; PANTIES; PANTIES, SHORTS, AND BRIEFS; PUMPS; |

| | | | |
|---|---|---|---|
| | | | SANDALS; SANDALS AND BEACH SHOES; SASHES; SCARFS; SCARVES; SHAPEWEAR, NAMELY, BRAS, PANTIES, CAMIES; SHAWLS; SHAWLS AND HEADSCARVES; SHAWLS AND STOLES; SHOES; SHOULDER SCARVES; SHOULDER WRAPS; SHOULDER WRAPS FOR CLOTHING; STRAPLESS BRAS; STRAPS FOR BRAS; THONGS; UNDER GARMENTS; UNDERCLOTHES; UNDERCLOTHING; UNDERGARMENTS; UNDERWEAR; WOMEN'S SHOES; WOMEN'S TOPS, NAMELY, CAMIS; WOMEN'S UNDERWEAR |

12. The above registrations for Plaintiffs' Trademarks are valid and subsisting, in full force and effect, and are incontestable pursuant to 15 U.S.C. § 1065. Plaintiffs' Trademarks have been used exclusively and continuously by Plaintiffs, and have never been abandoned. Genuine and authentic copies of the United States federal trademark registrations for the above-referenced Plaintiffs' Trademarks are attached hereto as **Exhibit 2.**

13. The Plaintiffs' Trademarks are exclusive to Plaintiffs and are displayed on Plaintiffs' Products and in Plaintiffs' marketing and promotional materials. Plaintiffs' Products have long been among the most popular bridal dresses and formalwear in the world and have been extensively promoted and advertised at great expense to the Plaintiffs.

14. The Plaintiffs' Trademarks are distinctive when applied to Plaintiffs' Products, signifying to the purchaser that the products come from Plaintiffs and are manufactured to Plaintiffs' quality standards. Whether Plaintiffs manufacture the products themselves or license others to do so, they have ensured that products bearing their trademarks are manufactured to the highest quality standards. Plaintiffs' Trademarks have achieved tremendous fame and recognition that has only added to the inherent distinctiveness of the marks. As such, the goodwill associated with the Plaintiffs' Trademarks is of incalculable and inestimable value to the Plaintiffs.

15. Plaintiffs have received extensive editorial coverage and unsolicited press in various magazines and other publications throughout the world. Plaintiffs' Products have been featured in the following publications: *Bridal Guide*, *Brides Magazine UK*, *Belle Bridal*, *Perfect Wedding*, *Hochzeit*, *You and Your Wedding*, *Wedding Ideas*, *Ireland's Wedding Journal*, *Novias de Pasarela*, *Panna Mloda*, *Wedding Venues & Services Magazine*, *The Best Scottish Weddings*, *Love Our Wedding*, *Perfect Wedding*, *Vogue Sposa*, *Wedding Magazine*, *Munaluchi Magazine*, *Brollops Magazinet*, *Inspire Weddings*, *Braut & Brautigam Magazine*, *Elle Spose Italia*, *White Sposa Russia*, *East Anglian Daily Times*, *Charleston Weddings* Genuine and authentic copies of the aforementioned press coverage for Plaintiffs' Products are attached hereto as **Exhibit 3**.

16. Plaintiff, Mon Cheri Bridals, LLC, also owns federal copyrights to hundreds of original photographs and images that it uses to advertise its bridal gowns and formalwear ("Mon Cheri Copyright"). A genuine and authentic copy of United States Copyright Registration No. VA 1-935-286 for the Mon Cheri Copyright is attached hereto as **Exhibit 4.**

17. The Mon Cheri Copyright is for original, copyrightable works of Mon Cheri. Mon Cheri has complied with all statutory formalities and requirements in obtaining the Mon

Cheri Copyright. Plaintiffs extensively use photographs and images protected by common law copyrights ("Plaintiffs' Copyrights") in connection with the marketing of Plaintiffs' Products on their Websites.

18. Genuine Plaintiffs' Products are widely legitimately advertised, promoted and offered for sale on the Websites primarily with original images owned by Plaintiffs and protected by the Mon Cheri Copyright and Plaintiffs' Copyrights. Plaintiffs have not authorized any of the Defendants to reproduce or otherwise disseminate the photographs and images protected by the Plaintiffs' Copyrights.

19. Over the past few years, Plaintiffs' marketing strategy and consumer education efforts have focused on increasing visibility on the Internet through search engines such as Google, Yahoo!, and Bing. Plaintiffs spend significant sums of money on Internet marketing and consumer education regarding its products, including search engine optimization ("SEO") strategies that allow Plaintiffs and others to fairly and legitimately educate consumers about the value associated with Plaintiffs' brands and the problems associated with counterfeiting and the unauthorized use of the Plaintiffs' Trademarks and Copyrights.

20. By engaging in "black hat" SEO strategies based upon their illegal use of the Plaintiffs' Trademarks and by creating a counterfeit marketplace in parallel to Plaintiffs' legitimate online marketplaces, Defendants are unlawfully taking the otherwise open and available marketplace space in which Plaintiffs and their authorized distributors and licensees have the right to fairly market their goods and associated brand message. Specifically, Defendants unlawfully use Plaintiffs' names and trademarks within the content, anchor text, and/or meta tags of fully interactive, commercial Internet stores identified in Schedule "A" to the Amended Complaint ("Infringing Websites") that advertise the sale of imitation knockoffs in

violation of Plaintiffs' intellectual property rights ("Counterfeit Products") in order to attract the automated eye of various search engines crawling the Internet looking for websites relevant to consumer searches for Plaintiffs' Products. Such unlawful use of the Plaintiffs' Trademarks and Copyrights results in unfair competition for Plaintiffs when competing for visibility on the Internet and deceives consumers into falsely believing they are buying legitimate Plaintiffs' Products from the Infringing Websites, when in fact they are purchasing Counterfeit Products.

21. The overwhelming success of the Plaintiffs' brands has resulted in significant counterfeiting by individuals and entities who unlawfully use the trademarks and goodwill built by Plaintiffs and other manufacturers in this industry to sell cheap imitation counterfeits of Plaintiffs' Products. Consequently, Plaintiffs have a worldwide anti-counterfeiting program and regularly investigate suspicious websites and online marketplace listings identified in proactive Internet sweeps and reported by consumers. As a result of the voluminous number of websites selling Counterfeit Products, Plaintiffs retained the services of Counterfeit.Technology, a company that provides online policy enforcement technology that identifies websites selling Counterfeit Products.

22. Counterfeit.Technology uses a large web crawler coupled with sophisticated algorithms and detection models to identify counterfeit products offered for sale across the Internet. The web crawler collects content from websites and the algorithms identify which of the websites are likely counterfeiters using a combination of information supplied by the brand owner, as well as inspecting the websites for characteristics consistent with counterfeiting.

23. A listing of selected examples Defendants' unauthorized use of the Plaintiffs' Trademarks on the Infringing Websites to advertise the sale of Counterfeit Products is attached hereto as **Exhibit 5**. This document was prepared by Counterfeit.Technology and authenticated

in the Declaration of Suren Ter Saakov. In this exhibit, selected screenshot from Defendants' Infringing Websites appear with the Plaintiffs' Trademarks highlighted on the page of the Infringing Website.

24. A listing of selected examples Defendants' unauthorized use of photographs protected by the Mon Cheri Copyright and Plaintiffs' Copyrights on the Infringing Websites to advertise the sale of Counterfeit Products is attached hereto as **Exhibit 6**. This exhibit provides a side-by-side comparison of stolen images displaying Counterfeit Products on the Infringing Websites and the original photographs protected by the Mon Cheri Copyright and Plaintiffs' Copyrights. This document was prepared by Counterfeit.Technology and authenticated in the Declaration of Suren Ter Saakov. In this exhibit, the stolen image from the Infringing Website is on the left, and the original image protected by the Mon Cheri Copyright and Plaintiffs' Copyrights is on the right. In each example, the images are identical or nearly identical.

25. Plaintiffs' investigation with Counterfeit.Technology establishes that Defendants are using the Infringing Websites to sell Counterfeit Products from foreign countries such as China to consumers in the United States and the State of Illinois, including this Judicial District. I personally analyzed each of the Infringing Websites and determined that Counterfeit Products were being offered for sale to residents of the United States and State of Illinois. I reached this conclusion through visual inspection of the products as they appeared on the Infringing Websites, the price at which the Counterfeit Products were offered for sale, other features commonly associated with websites selling counterfeit products, because Defendants offered shipping to Illinois, and because Defendants and the Infringing Websites do not conduct business with Plaintiffs and do not have the right or authority to use the Plaintiffs' Trademarks or Copyrights for any reason.

26. Defendants facilitate sales of Counterfeit Products by stealing original photographs from Plaintiffs' Websites that are protected by the Mon Cheri Copyright and Plaintiffs' Copyrights. Defendants design the Infringing Websites around these stolen images so that they appear to unknowing consumers to be authorized online retailers, outlet stores or wholesalers selling genuine Plaintiffs' Products. The Infringing Websites have a sophisticated layout, appear to be an authorized, legitimate Internet store, and accept payment in U.S. Dollars.

27. Each sale made by the Defendants through the Infringing Websites results in a direct loss to Plaintiffs. As the illegal marketplace for Plaintiffs' Products grows on the Internet, the legitimate marketplace for Plaintiffs' Products shrinks. Monetary damages cannot adequately compensate Plaintiffs for ongoing infringement because monetary damages fail to address the loss of control and damage to Plaintiffs' reputation and goodwill. Furthermore, monetary damages are difficult, if not impossible, to ascertain due to the inability to calculate measurable damage in dollars and cents caused to Plaintiffs' reputation and goodwill by acts of infringement.

28. Plaintiffs' goodwill and reputation are irreparably damaged when Plaintiffs' Trademarks are used on goods not authorized, produced or manufactured by Plaintiffs. Moreover, brand confidence is damaged, which can result in loss of future sales and market share. The extent of harm to Plaintiffs' reputation and goodwill and the possible diversion of customers due to loss in brand confidence are largely unquantifiable.

29. Plaintiffs' are further irreparably harmed by the unauthorized use of the Plaintiffs' Trademarks and Copyrights because counterfeiters take away Plaintiffs' ability to control the nature and quality of Counterfeit Products. Loss of quality control over goods bearing the

Plaintiffs' Trademarks and, in turn, loss of control over Plaintiffs' reputation, is neither calculable nor precisely compensable.

30. The sale of Counterfeit Products is likely causing and will continue to cause consumer confusion that weakens Plaintiffs' brand recognition and reputation. Consumers who mistakenly believe that the Counterfeit Products they purchased originated from Plaintiffs will come to believe that Plaintiffs offer low quality products. Inferior quality products will result in increased skepticism and hesitance in consumers presented with genuine Plaintiffs' Products, resulting in a loss or undermining of Plaintiffs' reputation and goodwill. Indeed, there is damage to Plaintiffs' reputation and goodwill even if a consumer knows that the goods he or she is purchasing are counterfeit. Prospective consumers who see inferior Counterfeit Products worn by others may mistakenly believe such goods to be genuine and may consequently develop a poor impression of Plaintiffs and the Plaintiffs' Trademarks. Such post-sale confusion results in damage to Plaintiffs' reputation and correlates to a loss of unquantifiable future sales.

31. Plaintiffs are further irreparably damaged due to a loss of exclusivity. Plaintiffs' extensive marketing and innovative designs are aimed at growing and sustaining sales. The Plaintiffs' Trademarks are distinctive and signify to consumers that the products exclusively originate from the Plaintiffs. When counterfeiters use the Plaintiffs' Trademarks on goods without Plaintiffs' authorization, the exclusivity of the Plaintiffs' Products, as well as Plaintiffs' reputation, are damaged and eroded, resulting in a loss of unquantifiable future sales.

32. Plaintiffs will suffer immediate and irreparable injury, loss or damage if an *ex parte* Temporary Restraining Order is not issued in accordance with Federal Rule of Civil Procedure 65(b)(1).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this 4th day of January, 2016

Stephen Lang